STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. LONNY McDAVITT, DEFENDANT-RESPONDENT.

Argued November 6, 1972—Decided December 18, 1972.

*Mr. Leonard N. Arnold,* Assistant Prosecutor, argued the cause for appellant (*Mr. Michael R. Imbriani,* Prosecutor of Somerset County, attorney).

*Mr. Joseph D. Haggerty* argued the cause for respondent (*Mr. Frank Metro,* attorney).

The opinion of the Court was delivered by

SULLIVAN, P. J. A. D., Temporarily Assigned. Defendant was found guilty, by jury verdict, of a violation of *N. J. S. A.* 2A:94–1 (breaking and entering with intent to steal). He was sentenced to an indeterminate term at the Youth Reception and Correction Center in Yardville. On appeal, the Appellate Division reversed the judgment of conviction in an opinion reported in 118 *N. J. Super.* 77 (1972). The Appellate Division held it was "plain error" to have the jury consider evidence of the results of a polygraph test taken by defendant during trial. The test was administered to defendant and the results thereof admitted into evidence by virtue of a stipulation entered into by defendant and his attorney and the State. The test results indicated that defendant was not telling the truth when he denied his involvement in the particular breaking and entering. This Court granted the State's petition for certification. 60 *N. J.* 351 (1972).

On January 26, 1970 at approximately 9:30 P.M. the police of Bridgewater Township responded to a reported breaking and entering involving a private dwelling. They found a cellar window broken in the house and upon conducting a search of the premises found a man, later identified as Michael Wescott, hiding under a bed and another man, later identified as Frank McGinnis, hiding in the bedroom closet.

The men were arrested, advised of their constitutional rights, and taken to police headquarters. There McGinnis told the police that defendant Lonny McDavitt was also involved in the breaking and entering and had been acting as lookout while McGinnis and Wescott entered the house. He gave the police the following description of defendant and the clothing he was wearing: "a white male wearing black trousers, a black ski jacket, work shoes, six feet four inches, heavy build, brown-blonde hair." This information was re-

ceived shortly after 10:00 P.M. and broadcast to all Somerset County police departments at 10:18 P.M. At 11:20 P.M. a teletype alarm was sent out for McDavitt who was apprehended in the Town of Dover, Morris County, around midnight of the same evening. When arrested, he was wearing clothing which closely matched the description given the police by McGinnis.

The only evidence implicating defendant in the crime came from McGinnis who had been jointly indicted with defendant, but pleaded guilty prior to trial and testified as a witness for the State. McGinnis had not yet been sentenced when he testified at defendant's trial that defendant had actually instigated the criminal activity, selected the house to be broken into, kicked in the cellar window, and was acting as lookout while McGinnis and Wescott entered the house.

Defendant took the stand in his own behalf. He denied involvement in or knowledge of the breaking and entering and asserted that he had not been in the company of McGinnis and Wescott any part of the day in question.

Wescott, who had previously pleaded guilty to a separate charge of breaking and entering and received a jail sentence, testified as a defense witness. His story was that only he and McGinnis were involved in the crime and that defendant was not with them that night.

Defendant's brother Lynn McDavitt, his mother LaVerne McDavitt, Mr. and Mrs. Anthony Tinc and William Strathem also testified in support of defendant's version of his whereabouts that evening.

The polygraph test incident which the Appellate Division found amounted to "plain error" came about as follows:

Detective James Ibach of the Bridgewater Township Police, a State's witness, had testified that in the early morning hours of January 27th, after word had been received of defendant's arrest in Dover, he and another officer went there with the arrest warrant, picked defendant up and brought him back to Bridgewater.

On cross-examination by defense counsel he was asked about the conversation he had with defendant while driving back from Dover. Specifically, counsel asked whether defendant told him "that you could submit him to some sort of test." The prosecutor's objection to the question was overruled and the detective answered that he did not recall any such offer. At a side bar conference the prosecutor again objected to this line of questioning and the court admonished defense counsel not to imply "that it is a polygraph test or a lie detector test, and I think under the circumstances you should not try to pursue this any further."

When defendant took the stand in his own defense he was asked by his attorney what he said when he arrived at the Bridgewater Police Headquarters after he had been brought there from Dover and learned, for the first time, the nature of the charge against him. His answer was "* * * I am trying to think of the detective's name whom I offered myself to take a polygraph test." The prosecutor objected to any reference to a polygraph test at side bar but the trial court overruled the objection. Defendant then testified that upon arriving at Bridgewater Police Headquarters and learning of the charges against him, he offered to take a lie detector test "to prove my innocence."

On cross-examination the prosecutor asked defendant whether he would be "willing to take a polygraph test today." Defendant answered in the affirmative.

At this point the jury was excused and the prosecutor advised the court that if defendant passed the polygraph test the State would not oppose a motion for acquittal. However, if he failed the test, the jury was to be informed of the results of the test. Counsel for defendant replied: "It is perfectly understandable and it is only fair."

Defendant after having been advised by the court that he had an absolute right to refuse to submit to the test, withdrew his consent and asked that the trial proceed. The prosecutor then stated that the only inference that could now be had was that defendant "is not innocent and the machine

will show it." He announced his intention to cross-examine defendant "on this very point" in order to rebut any inference the jury might otherwise draw from defendant's testimony on direct examination that he had offered to take a lie detector test "to prove my innocence."

A recess was taken during which defendant conferred with his counsel. Following the conference, defendant told the court that he would submit to the test. He was advised by the court that if he took the test the results would be introduced in evidence and the polygraph examiner allowed to testify and give his opinion as to whether defendant was telling the truth. Defendant answered that he understood and was willing, on a completely voluntary basis, to take the test and have the results put before the jury as evidence.

The jury was recalled and told of the understanding that had been reached. The trial was adjourned and the test administered the following day. Defendant failed the test. Upon resumption of the trial, counsel for defendant immediately moved to exclude the test results from evidence on the grounds that some of the questions asked defendant on the test were improper, and that case law in New Jersey clearly bars the use of the results of polygraph tests in criminal trials.[1]

The trial court denied the motion holding that it would not permit defendant to repudiate the stipulation. As to the allegedly improper questions, the court noted that defense counsel would have the opportunity on cross-examination to explore the matter.

Following the completion of defendant's cross-examination and the presentation of the testimony of defendant's remaining witnesses, the State called as its witness Louis Jasmine, the polygraph operator who had administered the test to defendant.

---

[1] Counsel also stated he had been unaware that the test was to be administered by a member of the State Police, "none the less I am not assailing the integrity of the gentleman in any sense."

Jasmine testified that he was the Assistant Chief Polygraphist of the New Jersey State Police. He related an extensive background in polygraph training and experience. There was no objection to his qualifications as an expert. Jasmine described in detail the equipment and procedures used in pre-testing and testing defendant and the nature of the questions asked. Three of the questions were directly relevant to defendant's involvement in the breaking and entering. Jasmine testified that defendant's negative answers to these questions were accompanied by physiological responses which "indicated significant emotional disturbances which are indicative of deception." Jasmine's opinion was that defendant was not telling the truth in the answers given. He said that while some test results can be inconclusive, in this particular case there was "no room for any error."

Preliminarily, we note that the trial court should have sustained the prosecutor's objection to any reference to a polygraph test. Proof that a defendant in a criminal trial either refused a lie detector test, or offered to submit to one, has been held to be not admissible in evidence. *State v. Driver*, 38 *N. J.* 255, 260–261 (1962) ; *State v. Peetros*, 45 *N. J.* 540, 545–546 (1965). This is the general rule. 29 *Am. Jur.* 2d, *Evidence,* § 296, p. 341. Had defendant not been permitted to testify about his "offer," the ensuing difficulty would have been avoided. However, it was defendant who insisted on getting before the jury evidence that he had offered to take a lie detector test to prove his innocence. Once this was heard by the jury, its impact was obvious. A motion for a mistrial would have been futile since the trial court had ruled the evidence was admissible. The only way the prosecutor could negate the inference the jury would undoubtedly draw was to ask defendant if he was presently willing to take such a test.

It is clear that defendant and his attorney provoked the situation. It is equally clear that defendant's decision to submit to a polygraph test and have the test results sub-

mitted to the jury was made only after he had been fully advised on his right to refuse, and the consequence of his submitting to the test.

To date New Jersey has adhered to the rule that lie detector testing has not yet attained scientific acceptance as a reliable and accurate means of ascertaining truth or deception. *State v. Driver, supra,* 38 *N. J.* at 261. This has been the general rule throughout the country. 29 *Am. Jur.* 2d, *Evidence,* § 831, pp. 923–925; *McCormick, Evidence* (2d ed. 1972), § 207, pp. 504–507.

Several courts, while recognizing the general rule, have made an exception where the State and the defendant stipulate to the admissibility of lie detector results. *People v. Houser,* 85 *Cal. App.* 2d 686, 193 *P.* 2d 937 (Dist. Ct. App. 1948) ; *State v. McNamara,* 252 *Iowa* 19, 104 *N. W.* 2d 568 (Sup. Ct. 1960). These decisions hold that the defendant is bound by the stipulation of admissibility.

In *State v. Valdez,* 91 *Ariz.* 274, 371 *P.* 2d 894 (Sup. Ct. 1962) the Arizona Supreme Court broadened the ground of admissibility by holding that the art of polygraph testing had developed to a point that its results were probative enough to warrant admissibility upon stipulation. However, in addition to the requirement of a formal stipulation, the court made admission subject to satisfactory proof that the examiner was qualified and the test properly conducted. Also, the opposing party was to have the right of full cross-examination of the polygraph examiner, and the jury was to be instructed as to the proper scope of consideration to be given such evidence.

Other jurisdictions have taken the position that a stipulation of admissibility does not make polygraph testing any more reliable and should not lead to any deviation in the exclusionary policy. *State v. Trimble,* 68 *N. M.* 406, 362 *P.* 2d 788 (Sup. Ct. 1961) ; *Pulakis v. State,* 476 *P.* 2d 474 (Alas. Sup. Ct. 1970).

Within the framework of this appeal it is unnecessary to reconsider the broad issue of admissibility *vel non* of poly-

graph test evidence in a criminal case.[2] Indeed, the record herein is inadequate for that purpose. As heretofore noted, the general rule has been one of exclusion. However, within recent months two trial courts in criminal cases, after conducting extensive hearings on the present reliability of polygraph tests, found that such testing is now generally accepted by authorities in the field and is capable of producing highly probative evidence in a court of law when properly used by competent, experienced examiners. *United States v. Ridling,* 350 F. Supp. 90 (E. D. Mich. Oct. 6, 1972); *United States v. Zeiger,* 12 *Crim. L. Rptr.* 2057 (D. D. C. Oct. 10, 1972).

Here we have a much more narrow issue in view of the prior stipulation as to admissibility entered into by defendant and his attorney and the State. The circumstance under which the stipulation came into existence is also a consideration since defendant, over the prosecutor's objection, insisted on injecting into the case his prior offer to take a lie detector test "to prove my innocence." *Cf. Williams v. State,* 238 *So.* 2d 137 (Fla. Dist. Ct. App. 1970); *Lucas v. State,* 479 *S. W.* 2d 314 (Tex. Cr. App. 1972).

This Court will take judicial notice of the fact that polygraph testing is used extensively by police and law enforcement agencies, government agencies and private industry for investigative purposes. *McCormick, Evidence,* (2d ed. 1972), § 207, p. 507. Its growing use as a scientific tool cannot be doubted. "The Truth about Lie Detectors in Business," *The New York Times,* Oct. 29, 1972, § 3 at 3, col. 1. The record herein indicated that polygraph testing is used by the New Jersey State Police in its investigations. The assistant chief polygraphist of the State Police, who examined defendant in this case, testified that he had conducted more than 5,000 polygraph examinations in all types

---

[2]This subject is scheduled for discussion at the next Judicial Conference of New Jersey to be held in the Spring of 1973.

of criminal investigations and had appeared as an expert witness on polygraphy in the courts of New Jersey on over 100 occasions on behalf of defendants as well as the State.

■ We conclude that polygraph testing has been developed to such a point of reliability that in a criminal case when the State and defendant enter into a stipulation to have defendant submit to a polygraph test, and have the results introduced in evidence, such stipulation should be given effect. *Cf. State v. Arnwine*, 67 *N. J. Super.* 483 (App. Div. 1961). Polygraph testing has sufficient probative value to warrant admission under these circumstances.

■ Of course, it must appear that the stipulation is clear, unequivocal and complete, freely entered into with full knowledge of the right to refuse the test and the consequences involved in taking it. It must also appear that the examiner is qualified and the test administered in accordance with established polygraph techniques.

■■ The record before us shows that the foregoing requirements were substantially satisfied. The fact of the stipulation, its completeness and defendant's willingness to enter into it after having been fully advised of his right to refuse the test and the possible consequences of his submitting to it, is fully spread upon the record. The examiner's extensive training and impressive qualifications were conceded. Defendant (except as noted in his motion to exclude the test results, and not pursued thereafter to any extent), did not question the testing equipment or the technique used by the examiner, nor was there a serious challenge to the examiner's evaluation of defendant's physiological responses as indicating deception.[3] Under the circumstances we conclude the evidence was properly admitted.

---

[3]The examiner in his testimony referred to the charts which recorded defendant's physiological responses. Neither the State nor defendant requested that these charts be produced. The better practice would be to have the charts and their correlation to the questions and answers made a part of the record.

■■ Where polygraph test results are admitted into evidence, the jury should be instructed as to the consideration to be given such testimony. It is not direct proof of a defendant's guilt or innocence of the crime charged. It is opinion evidence by an expert and tends only to indicate whether or not the subject was telling the truth when tested. It is for the jury to decide what weight and effect such evidence should be given.

Here the trial court instructed the jury as follows:

> I instruct you that the examiner's testimony does not tend to prove or disprove any element of the crime with which this defendant was charged but it tends to indicate that at the time of the examination the defendant was not telling the truth. Again, I remind you that this test is not conclusive. Further, it is for you to determine what corroborative weight and effect such testimony should be given.

Defendant claims it was plain error for the prosecutor during summation, to refer to the polygraph test as "scientific evidence." He also charges plain error in that portion of the court's charge (*supra*) which instructed the jury that the examiner's testimony did not tend to prove or disprove any element of the crime charged, but only indicated that at the time of the test defendant was not telling the truth.

■ We find no error. The prosecutor's use of the term "scientific evidence" in referring to polygraph testing was fair comment and within permissible limits. The court's full charge on the consideration to be given the examiner's testimony, quoted above, was substantially correct.

■ Defendant's further contention that it was prejudicial error to permit the polygraph examiner to testify as a legal expert is without merit. We grant that it was improper to allow the polygraph examiner to express the legal opinion that juries in New Jersey may be informed of test results when the State and defendant consent in advance to admis-

sibility. However, defendant was not prejudiced thereby. The trial court ruled the evidence was admissible in this case and, as heretofore noted, correctly instructed the jury as to the consideration to be given such evidence.

Defendant asserts "plain error" in the surrebuttal testimony of Frank McGinnis. After the State had rested its case, the defense called McGinnis as its witness and questioned him about a written statement he had given the police following his arrest in which he referred to an attempt he made to call an F.B.I. agent after he met defendant at a diner and before they became involved in the breaking and entering. Defense counsl pressed McGinnis as to why he had not mentioned the phone call in his earlier testimony. One of the questions asked McGinnis, and his answer thereto, was as follows:

> Q. Do you remember having testified earlier in this case and not having made mention of your having gone into a phone booth to call Mr. Lee [the F. B. I. agent] in order to squeal on Mr. McDavitt?
>
> A. Well, they wanted to know where the money we stole was. They wanted to know where the money robbed from the bank was.

Defense counsel's only objection at the time was that the witness was not answering the question directly. It is now argued that the answer implicated defendant in a crime of which he had not been convicted and thereby prejudiced him in the eyes of the jury.

 We find no plain error. The defense knowingly pursued a subject fraught with the danger of the disclosure that defendant had a charge of bank robbery pending against him. Having provoked the response, defendant cannot claim he was prejudiced thereby. Moreover, this isolated reference to "money we stole" was not pursued further. In the overall picture, the matter did not have such magnitude as to constitute plain error. *R.* 2 :10–2.

 Finally, we conclude that the State established a *prima facie* case of defendant's guilt. Frank McGinnis un-

equivocally implicated defendant in the criminal endeavor. While the testimony of defendant and his witnesses was directly to the contrary, there was some corroboration of McGinnis' story and numerous inconsistencies in the testimony of the defense witnesses. The situation presented was a typical jury issue. The verdict of guilty finds ample support in the record.

The judgment of the Appellate Division is reversed and the judgment of conviction is hereby reinstated.

*For reversal*—Chief Justice WEINTRAUB, Justices JACOBS, HALL and MOUNTAIN, and Judge SULLIVAN—5.

*For affirmance*—None.