12 A.3d 258 (2011)
418 N.J. Super. 138
STATE of New Jersey, Plaintiff-Respondent,
v.
Emmanuel MERVILUS a/k/a Emmanuel Mervilous a/k/a Emanuel Mervilus a/k/a Emmonvel Mervilus a/k/a Emmanuel Mervelous, Defendant-Appellant.
Docket No. A-5812-07T3.
Superior Court of New Jersey, Appellate Division.
Submitted January 18, 2011.
Decided February 15, 2011.
Caruso & Diaz, L.L.C., attorneys for appellant (John D. Caruso, on the brief).
Theodore J. Romankow, Union County Prosecutor, attorney for respondent (Meredith L. Balo, Assistant Prosecutor, of counsel and on the brief).
Before Judges LISA, REISNER and ALVAREZ.
The opinion of the court was delivered by
REISNER, J.A.D.
Defendant Emmanuel Mervilus appeals from his conviction for first degree robbery, N.J.S.A. 2C:15-1, and aggravated assault, N.J.S.A. 2C:12-1b(1), -1b(2). Based on improper expert testimony concerning polygraph evidence, we reverse the conviction and remand for a new trial. If the State intends to rely on polygraph evidence at the re-trial, the State must first establish the reliability of polygraph *259 evidence at a Frye[1] hearing. At the N.J.R.E. 104 hearing, the defendant may also challenge the reliability of his individual polygraph test, e.g., whether the machine was working properly or the expert administered the test correctly. However, as we construe State v. A.O., 198 N.J. 69, 965 A.2d 152 (2009), a Frye hearing is mandatory.

I
We begin by summarizing the most pertinent history and the trial evidence. At a pretrial hearing, all counsel agreed to the following facts as alleged by the State: Near the intersection of Morris and Union Avenues in Elizabeth, the victim, Miguel Abreu,[2] flagged down two police officers. He reported that he had been robbed by three men, one of whom stabbed him and another of whom fled on a bicycle with his backpack. Abreu said he had followed the two remaining assailants down Morris Avenue. He pointed out two men standing some distance away and told the officers that they had attacked him. Based on this identification, the police arrested defendant and co-defendant, Daniel Desire.
Relying on State v. Ruffin, 371 N.J.Super. 371, 853 A.2d 311 (App.Div.2004), the judge denied a Wade[3] hearing because defendant presented "no evidence . . . which alleges that the officers were, in any way, suggestive" and "[i]n fact, there is no evidence that they said anything to the victim prior to his identifying" the two suspects.
At the trial, Abreu testified that after leaving work he rode his bicycle to the Rahway train station and took the train home to Elizabeth. As Abreu and a co-worker were walking away from the Elizabeth train station along Morris Avenue, they encountered a group of three men. Abreu described them as two tall black men wearing their hair "rolled," and one man who was "very little." One of the tall men grabbed Abreu's arms from behind, while the other tall man approached him from the front. The man in front swung a knife at Abreu and cut him. According to Abreu, as he was trying to escape, his backpack started to slip off one of his arms. The man behind him pulled the backpack off Abreu's other arm and handed it to the small man, who fled on "a small bike that they had." Although the two larger men then walked away, Abreu testified that he "never lost sight" of them from the time they attacked him until the police arrived and he was able to point them out to the officers.
At the trial, Abreu claimed that he got a good look at the two larger men. But when asked if he saw either of them in the courtroom, Abreu identified a spectator whom he said resembled the assailant who stabbed him.[4] On cross-examination, he admitted that he could not positively identify either attacker in the courtroom. However, he testified that he was sure that the two men whom the police arrested on the night of the attack were the ones who robbed him. He asserted that he knew that the police were arresting the right suspects because a knife was found on the ground near the two arrestees.
According to Officer Benenati, he was passing by in his patrol car when Abreu rolled his bicycle into the street in front of *260 the police vehicle, showed the officer his stab wound and asked for help.[5] When Benenati asked who stabbed him, Abreu pointed to two men who were walking about 100 yards away. After Benenati's partner recovered a knife about ten feet from the two suspects, Abreu was able to identify it as the knife used to stab him.[6] The suspects, later identified as defendant and Desire, were photographed at the police station. Benenati then showed copies of those photographs to Abreu, who identified the subjects as his attackers. In his testimony, Benenati also identified the men in the photographs as being the persons he arrested on the night of the assault.
Before the trial, defendant, who was represented by counsel, signed an agreement to take a polygraph test and stipulated to its admissibility at his trial. The State presented the test results through the testimony of a polygraph expert, Lieutenant John Kaminskas. He first explained in general how a polygraph worked, repeatedly referring to the different reactions of persons who were "innocent" as opposed to those who were "guilty." He also referred to the ability of the test to differentiate persons who were "telling the truth" as opposed to those who were "lying."
After next describing the results of defendant's polygraph test, during which defendant denied involvement in the robbery, Kaminskas was asked if he was "able to develop an opinion whether or not Mr. Mervilus was telling the truth." Summarizing his views, Kaminskas testified that "in my opinion . . . he wasn't telling the truth." Under questioning from the prosecutor, Kaminskas also testified that in his extensive experience as a polygrapher, in "between 60 and 70 percent of the . . . tests I conduct[,] I find the . . . people are truthful." In those cases, he would report the results to the "investigating officers" and "a lot of times the case is terminated or charges against the person are dropped."
On cross-examination, Kaminskas referred to the test as "not just a lie detector [but] also a truth indicator." He testified that he had never encountered a situation in which he had opined that "someone was. . . showing signs of deception, and [it later] came out that they were truthful." He also described a "guilty" suspect as being "a little more anxious ... because they know that the truth is going to be found out."
Defendant testified that he was not involved in the attack on Abreu. According to defendant, he insisted on taking a polygraph test because he believed it would establish his "innocence." He testified that at the time he took the test, he was distraught because his mother had just died. When told that he failed, defendant offered to re-take the polygraph test, but he was not permitted to do so. Defendant was cross-examined extensively about the polygraph results.

II
On this appeal defendant presents the following points for our consideration:
POINT I: THE EVIDENCE WAS INSUFFICIENT TO SUPPORT A CONVICTION AND THE VERDICT WAS *261 AGAINST THE WEIGHT OF THE EVIDENCE.
POINT II: AGGREGATE ERRORS DEPRIVED THE DEFENDANT OF A FAIR TRIAL.
A. THE TRIAL COURT ERRED IN ADMITTING INTO EVIDENCE THE RESULTS OF A POLYGRAPH TEST WITHOUT FIRST DETERMINING THAT THE EVIDENCE WAS RELIABLE AT A PRE-TRIAL HEARING (NOT RAISED BELOW).
B. THE TRIAL COURT ERRED BY PERMITTING THE STATE TO OFFER IMPROPER EXPERT TESTIMONY THEREBY PREJUDICING THE DEFENDANT'S RIGHT TO A FAIR TRIAL (NOT RAISED BELOW).
C. THE TRIAL COURT ERRED IN DENYING TRIAL COUNSEL'S MOTION FOR A WADE HEARING CONCERNING MR. ABREU'S OUT-OF-COURT "SHOW-UP" IDENTIFICATION OF MR. MERVILUS NEAR THE SCENE OF THE INCIDENT.
D. TRIAL COUNSEL'S FAILURE TO CHALLENGE THE ADMISSIBILITY OF THE PATENTLY ILLEGAL OUT-OF-COURT PHOTO IDENTIFICATION PROCEDURE CONSTITUTED INEFFECTIVE ASSISTANCE OF COUNSEL.
E. THE PROSECUTOR'S CROSS-EXAMINATION OF MR. MERVILUS AND COMMENTS IN SUMMATION CONCERNING HIS POST-ARREST SILENCE VIOLATED HIS RIGHT AGAINST SELF-INCRIMINATION AND DEPRIVED HIM OF A FAIR TRIAL (NOT RAISED BELOW).
F. THE PROSECUTOR'S COMMENTS IN SUMMATION SUGGESTING THAT MR. MERVILUS'S TESTIMONY WAS TAILORED DEPRIVED MR. MERVILUS OF HIS RIGHT TO A FAIR TRIAL.
G. IMPROPER COMMENTS MADE BY THE PROSECUTOR DURING SUMMATIONS SHIFTED THE BURDEN OF PROOF AND DEPRIVED DEFENDANT OF HIS RIGHT TO A FAIR TRIAL (NOT RAISED BELOW).
H. THE TRIAL COURT ERRED IN FAILING TO CHARGE THE JURY THAT IT COULD FIND DEFENDANT GUILTY OF SECOND DEGREE ROBBERY UNDER A THEORY OF ACCOMPLICE LIABILITY.
Having reviewed the record, we decline to consider Point II D, State v. Sparano, 249 N.J.Super. 411, 419, 592 A.2d 608 (App.Div.1991), and we conclude that Point I and Points II C and E through H are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2). Thus, we turn to Points II A and B, concerning the polygraph evidence.
Defendant makes two arguments. First, relying on State v. A.O., supra, a case decided a year after his trial was conducted, he contends that the trial court should not have admitted the polygraph evidence without first holding an N.J.R.E. 104 hearing to determine its reliability. Second, he contends that by explaining the polygraph results in terms of "innocent" and "guilty" test takers, the polygraph expert implicitly and improperly testified as to defendant's guilt.
In State v. A.O., the Court reaffirmed that polygraph evidence is generally inadmissible, and specifically held that it is inadmissible where an uncounseled defendant enters into a stipulation. However, the Court declined to overrule the "narrow" holding of State v. McDavitt, 62 N.J. 36, 44-46, 297 A.2d 849 (1972), allowing polygraph stipulations where a defendant enters into the agreement with advice of *262 counsel. A.O., supra, 198 N.J. at 90, 965 A.2d 152.
In considering whether to go further and bar polygraph evidence altogether, the Court acknowledged that such evidence might be unreliable.[7]
[Recent] studies explain that polygraphy relies on two assumptions: (1) that deception triggers certain emotional states; and (2) that those emotional states produce specific, measurable physiological changes in the body. As certain empirical evidence has shown, however, there is substantial variation in how individuals respond physiologically when they are lying or telling the truth, and the responses that humans produce in such situations are not specific to either deception or truth-telling. The inherent ambiguities in such responses, which arise from individual variations in the subject's cardiovascular, electrodermal and respiratory activity, often make it difficult for a test administrator to determine if the examinee is lying, nervous, tired, or simply trying to game the system.
... Even more troubling, "to the extent that the polygraph errs, studies have repeatedly shown that the polygraph is more likely to find innocent people guilty than vice versa."
[Id. at 91-92, 965 A.2d 152 (citations omitted).]
See also State v. Domicz, 188 N.J. 285, 311-14, 907 A.2d 395 (2006). The Court also noted that juries are likely to give polygraph evidence "undue weight" because "many lay people tend to view polygraph evidence as bordering on infallible." A.O., supra, 198 N.J. at 92, 965 A.2d 152.
While the Court declined to prohibit the use of polygraph evidence altogether due to the lack of a sufficient factual record in the case before it, the A.O. opinion required that such a record be made in any future case where a party sought to introduce polygraph evidence:
Because we lack a factual record, we cannot fully address those issues today. However, a proper record will have to be developed in the trial court the next time a party seeks to introduce stipulated polygraph evidence, agreed to by both sides. That evidence should be introduced only if the parties can first establish its reliability at an N.J.R.E. 104 hearing.
[Ibid. (emphasis added).]
Against that legal backdrop, we first address the testimony of the polygraph expert. Because the defense did not object to that evidence at trial, we consider defendant's arguments under the plain error rule. R. 2:10-2; State v. Macon, 57 N.J. 325, 336, 273 A.2d 1 (1971).
The State presented testimony from Lieutenant Kaminskas, the same polygraph expert who testified in A.O. As in A.O., under questioning by the prosecutor, Kaminskas gave testimony designed to convince the jury that polygraph tests are infallible. See A.O., supra, 198 N.J. at 77, 965 A.2d 152. His testimony also communicated that the tests are designed to separate the "innocent" from the "guilty." Not only did he use those words to describe the test takers, but he told the jury that a "guilty" subject would be more nervous than an "innocent" one.
In explaining how a polygraph exam is administered, the expert also used the terms "guilty" and "innocent." For example, in explaining the difference between "control questions" and "relevant questions" pertaining to the crime, he stated *263 that "a person [who] actually did the crime, or wasparticipated in the incident, will react to [relevant] questions ... [whereas] a person who is innocent, or had no involvement in the incident, will react to [other types of] question[s]." He testified that a person who "reacts more" to the relevant test questions was "lying." Kaminskas also opined that defendant reacted to relevant questions and his answers, indicating that he had no involvement with the robbery, showed deception, meaning the defendant "wasn't telling the truth." Although the expert did not explicitly state that he believed defendant was guilty, his testimony implicitly constituted an opinion on defendant's guilt.
In eliciting his testimony that polygraph results, where obtained, often determined whether a defendant would be prosecuted, the State further emphasized to the jury the importance of polygraph evidence. According to Kaminskas, in 60-70 percent of the exams he administers, the test taker is truthful, and "a lot of the times the case is terminated or charges against the person are dropped." His testimony thus communicated to the jury that law enforcement agencies believe guilty people will fail a polygraph test and innocent people will pass.
An expert may testify as to opinions highly relevant to whether a defendant committed the crime charged, "even though it embraces ultimate issues that the jury must decide." State v. Odom, 116 N.J. 65, 79, 560 A.2d 1198 (1989). But an expert may not invade the jury's province by expressing an opinion as to a defendant's guilt.
We have repeatedly and consistently recognized that a jury's determination of criminal guilt or innocence is its exclusive responsibility. A jury's verdict of ultimate criminal liability can never be equated simply with its determination of underlying facts; the determination of guilt or innocence transcends the facts on which it is based, no matter how compelling or inexorable those facts may be. The determination of facts that serve to establish guilt or innocence is a function reserved exclusively to the jury. Hence, an expert's testimony that expresses a direct opinion that defendant is guilty of the crime charged is wholly improper.
[Id. at 77, 560 A.2d 1198 (citations omitted).]
Nor may an expert accomplish the same improper goal indirectly. "It may be that an expert's opinion is expressed in such a way as to emphasize that the expert believes the defendant is guilty of the crime charged under the statute. This would be impermissible." Id. at 80, 560 A.2d 1198. The prosecution may "not properly seek a favorable resolution of the fact issues committed to the jury for resolution by bolstering the testimony of its only fact witness with the opinion of an expert on the ultimate issue." State v. Boston, 380 N.J.Super. 487, 494, 882 A.2d 987 (App.Div.2005), certif. denied, 186 N.J. 243, 892 A.2d 1290 (2006).
Kaminskas' improper testimony also implicated the very concerns that the Court expressed in A.O.that jurors would perceive polygraph evidence as infallible and would give it disproportionate weight in deciding to convict or acquit a defendant. Adding to the mix the serious questions about the reliability of polygraph evidence, its misuse is all the more troubling.
We conclude that admission of the improper polygraph evidence was prejudicial error warranting reversal of defendant's conviction. While this is a closer case than A.O., in which there were significant weaknesses in the State's case, we cannot describe the State's evidence against defendant *264 as overwhelming. This is not a case in which, for example, a defendant was caught red-handed selling drugs to an undercover police officer. See, e.g., State v. Nesbitt, 185 N.J. 504, 508, 888 A.2d 472 (2006). Here, the police came on the scene after the assault, and the State's case hinged to a great degree on the victim's testimony. The victim claimed to have gotten a good look at the assailants but mis-identified a courtroom spectator as being one of the robbers, and he could not identify defendant in the courtroom. A knife was found moments after the stabbing, but it bore no traces of blood and no fingerprints. Defendant testified, and thus his credibility was in issue. The improper polygraph testimony could have made a difference to the outcome. State v. Macon, supra, 57 N.J. at 336, 273 A.2d 1. Therefore, we reverse defendant's conviction and remand this case for re-trial.
We next address defendant's argument that A.O. should be applied retroactively and that the trial court should have sua sponte held an N.J.R.E. 104 hearing concerning the reliability of polygraph evidence. The Court's language in A.O., concerning the need for such a hearing in the "next" case, implies prospective application. However, in light of our determination that the improper polygraph testimony warrants reversal of defendant's conviction, we need not address the retroactivity issue.
We add the following comments for the trial court's guidance on remand. In considering whether polygraph evidence should be banned altogether, the Court stated that any future attempts to introduce polygraph evidence in a criminal trial would require a preliminary determination as to its reliability. A.O., supra, 198 N.J. at 92, 965 A.2d 152. Therefore, if the State intends to rely on polygraph evidence, it must first prove the reliability of such evidence at an N.J.R.E. 104 hearing. Ibid.
On this appeal, defendant asserted his right, at the N.J.R.E. 104 hearing, to challenge the proper functioning of the testing equipment and the manner in which the test was administered. But we construe A.O. as requiring much more. The Court clearly intended that a record be created on the omnibus issue of whether polygraph evidence should be permitted or barred. Therefore, the State must carry the burden to prove that polygraph test results are "generally accepted, within the relevant scientific community, to be reliable." State v. Chun, 194 N.J. 54, 91, 943 A.2d 114, cert. denied, ___ U.S. ___, 129 S.Ct. 158, 172 L.Ed.2d 41 (2008) (Alcotest found scientifically reliable); State v. Harvey, 151 N.J. 117, 169-71, 699 A.2d 596 (1997), cert. denied, 528 U.S. 1085, 120 S.Ct. 811, 145 L.Ed.2d 683 (2000) (finding DNA evidence admissible); Frye, supra, 293 F. at 1014 ("systolic blood pressure deception test" held inadmissible as lacking scientific reliability).
Reversed and remanded.
NOTES
[1] Frye v. United States, 293 F. 1013, 1014 (D.C.Cir.1923).
[2] Mr. Abreu's full name is Miguel Abreu Barrientos, but he ordinarily uses Abreu as his last name.
[3] United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).
[4] Both sides stipulated before the jury that this individual was not the co-defendant, Daniel Desire.
[5] Abreu testified that he encountered a passerby who called the police for him. Benenati testified that no one summoned him to the scene; he just happened to be on patrol in that area.
[6] The State stipulated that tests performed on the knife revealed no blood or fingerprints.
[7] See State v. A.O., 397 N.J.Super. 8, 30, 935 A.2d 1202 (App.Div.2007) (Weissbard, J.A.D., concurring)(urging the Court to bar the use of polygraph evidence due to its unreliability).