**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 21-3185

———————

EMMANUEL MERVILUS,

Appellant

v.

UNION COUNTY; DANIEL VANISKA; CHIEF OF
POLICE RONALD SIMON; *PACE KAMINSKAS, as
Executor of the Estate of John Kaminskas; EDWARD
BENENATI; ROBERT PEREZ; MICHAEL BARROS;
JOHN DOE IDENTIFICATION OFFICERS

(*Amended per Court's Order dated 1/05/2023)

———————

Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 2-14-cv-07470)
District Judge: Esther Salas

———————

Argued on January 19, 2023

Before: AMBRO*, PORTER, and FREEMAN, <u>Circuit Judges</u>

(Opinion Filed: July 13, 2023)

David B. Shanies [**Argued**]
David B. Shanies Law Office
110 West 40th Street
New York, NY  10018

Steven J. Zweig
Office of Attorney General of New Jersey
Division of Law
25 Market Street
Hughes Justice Complex
Trenton, NJ  08625

Counsel for Appellant

Steven H. Merman
Moshood Muftau **[Argued]**
Office of County Counsel
10 Elizabethtown Plaza
Union Cunty Administration Building
Elizabeth, NJ  07207

---

\*Judge Ambro assumed senior status on February 6, 2023.

Peter H. Spaeth
Wolff Helies Duggan Spaeth & Lucas
Suite 201-202
2517 Highway 35
P. O. Box 320, Building K
Manasquan, NJ  08736

Edward J. Kologi
Michael S. Simitz **[Argued]**
Kologi & Simitz
500 N. Wood Avenue
Suite 4B
Linden, NJ  07036

Catherine M. Deappolonio
Robert F. Renaud
Renaud Colicchio
190 North Avenue E
3rd Floor
Cranford, NJ  07016

Robert F. Varady
LaCorte Bundy Varady & Kinsella
989 Bonel Court
Union, NJ  07083

Counsel for Appellees

---

OPINION OF THE COURT

---

AMBRO, Circuit Judge

Emmanuel Mervilus sued Detective John Kaminskas for fabricating polygraph evidence and Kaminskas's supervisors for failing to train or supervise his polygraph work. We decide two principal questions. First, did Mervilus introduce sufficient evidence to try his fabrication-of-evidence claim against Kaminskas? We hold he did. Second, is his *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), claim against Kaminskas's employer, Union County, viable even if Kaminskas did not fabricate evidence? We hold it is because a jury might not render an inconsistent verdict if it found the County liable but Kaminskas not culpable.

## I.    **Background**

In October 2006, Mervilus lived in New Jersey with his mother, a cancer patient, and his two younger siblings. He worked at a cooking oil company and, at age 22, singlehandedly provided for his household. His life changed drastically that month when he and a friend, Daniel Desire, went for a late-night walk. During it, they watched a man, later identified as Miguel Abreu, flag down a police car, reveal to officers his stab wound, and accuse Mervilus and Desire of robbing and stabbing him. Indignant, Mervilus stayed at the scene and insisted that Abreu look closely at them to understand he had identified the wrong men. But to no avail.

4

Officers arrested Mervilus and charged him with first degree robbery, N.J.S.A. § 2C:15–1, second degree aggravated assault, N.J.S.A. § 2C:12–1b(1), third degree aggravated assault, N.J.S.A. § 2C:12–1b(2), and third degree possession of a weapon for an unlawful purpose, N.J.S.A.§ 2C:39–49d.

Eager to clear his name, Mervilus agreed to take a polygraph examination. Earlier that year, officers dismissed drug charges after a polygraph exam indicated he truthfully denied responsibility. So Mervilus agreed to be tested again because he "believed, at the time, [polygraphs] tell the truth." A567.

Polygraph science aspires to determine an examinee's truthfulness by measuring his or her physiological responses to a series of questions. "Polygraph tests are psychological tests that use physiological measures to make inferences about a person's psychological state when that person is asked a series of questions to which he or she must respond with either a truth or lie." A416. Put simply, they are premised on the belief that liars have certain "tells" that are detectable through sudden changes to their blood pressure, pulse rate, perspiration, and respiration.[1]

---

[1] Polygraph examinations are the subject of much criticism and "do not enjoy general acceptance from the scientific community." *United States v. Laurent*, 603 F. Supp. 3d 1247, 1257 (S.D. Fla. 2022). Thus, most states generally do not permit their admission, while other states only admit such evidence on the consent of both parties. *See State v. A.O.*, 965 A.2d 152, 161–62 (N.J. 2009) (collecting cases). This case, however, does not require us to scrutinize polygraphs generally, and so we do not wade into that debate.

When Mervilus sat for his exam, New Jersey permitted polygraph results to be admitted at trial if there was a "stipulation [that] is clear, unequivocal and complete, freely entered into with full knowledge of the right to refuse the test and the consequences involved in taking it." *State v. McDavitt*, 297 A.2d 849, 855 (N.J. 1972). The State also required examiners to be "qualified and the test administered in accordance with established polygraph techniques." *Id.* Union County and Mervilus entered a stipulation reflecting those requirements. He consented to be tested, agreed the results would be admissible, and waived his "right to introduce another polygraph expert . . . in reference to the original polygraph expert's testimony." A1798–99. Further, Union County guaranteed the examiner would be "an expert in all phases of both administering polygraph examinations and in the analysis of polygraph chart recordings." A1798.

The Union County Police Department selected Kaminskas, its only certified polygraph examiner, to conduct the exam.[2] When the Police Department bought a polygraph in the mid-1990s, its Chief allowed Kaminskas to learn how to conduct examinations. He did so by attending the National Training Center, where he learned the "Arther Method" from its founder, Richard Arther.

---

[2] Kaminskas died while this appeal was pending. We granted Mervilus's motion to substitute in Kaminskas' place the executor of his estate. *See* Order to Substitute Party, D.I. 50 (Jan. 5, 2023).

The Arther Method is an outlier in the polygraph world. It is not accredited by the American Polygraph Association. An authoritative polygraph treatise published in 2002 never mentioned it. And a peer-reviewed list of validated polygraph techniques, published in 2006, also did not include it. *See* Donald J. Krapohl, *Validated Polygraph Techniques*, 35 Polygraph 123, 149 (2006). Defendants' expert, Dr. Palmatier, conceded it has not "been subjected to peer review." A1197. And juxtaposing it with conventional polygraph methods explains why it was so poorly regarded within the field.

The Arther Method relies heavily on subjective observations to test whether an examinee is truthful, in contrast to conventional polygraph approaches that primarily use objective physiological data. Among the 24 non-physiological factors the Method treats as instructive are the following:

- If the examinee is local and arrives with a third party, he or she is probably lying.
- First-born children are usually more nervous and ambitious.
- The more thoroughly an examinee washes his or her hands, the more likely he or she is telling the truth.
- "The sexier a lady is dressed, the more likely she is lying." A750.
- Liars will either sleep too much or too little on the night before the examination. Sleeping too little is the mark of someone who drank too much the night prior, which liars tend to do. But sleeping too much, on the other hand, suggests the examinee is an escapist.

7

- The examiner should instruct the examinee to read a journal article before the examination. An examinee who reads that article is more likely to be truthful.

The Arther Method also incorporates the physiological analysis used in conventional polygraph methods. However, although conventional methods consider the absence of physiological reactions to reveal truthfulness, this one teaches that "at least 85% of the non-reactors are LYING to the crime questions." A1787 (emphasis in original). Indeed, the Method believes many liars' physiological reactions are not detected because their identity or social standing permits them to lie without guilt, thus not triggering the typical physiological responses. For example, the Method teaches certain ethnic groups "do[] not experience any guilt feelings when [they] lie[] . . . because [they do] not consider lying to be socially unacceptable." *Id.* And the same goes for those with low social standing, who will not care "what will happen if [they are] exposed as [] liar[s]." *Id.* Thus, though the Arther Method considers physiological responses in its analysis, it relies on prejudiced assumptions to dismiss what other methods deem an indicator of truthfulness.

In May 2007, Kaminskas tested Mervilus to determine whether he stabbed and robbed Abreu. In line with the Method's teachings, Kaminskas first asked Mervilus a series of personal questions. Among them: Was Mervilus the first-born children of his parents?; Who raised him?; Was he married?; Was he a high school graduate? After Kaminskas recorded his own observations, he tested Mervilus's physiological reactions to a series of eight questions. Of them, four were relevant questions pertaining to the crime at issue and four were control questions.

8

The four relevant questions were:

R3K: Do you know for sure who robbed and stabbed someone on 10/19/06 in Elizabeth?
R5: Did you rob someone of their backpack on 10/19/06 in Elizabeth?
R8: Is the person who was robbed and stabbed wrong when he said you held him and took his backpack?
R9: Were you holding someone when Daniel Desire stabbed them on 10/19/06 in Elizabeth?

Mervilus denied any responsibility for the crime and therefore answered the latter three questions with a "no." But Kaminskas's first question, R3K, did not ask whether he committed the crime. Instead, it asked whether he knew "for sure" who did. He answered with a "yes," explaining that someone told him who committed the crime. But Kaminskas pushed back, telling Mervilus he could not answer he knew "for sure" who committed the crime based on hearsay. Kaminskas then re-asked the question and Mervilus answered it the same way. But Kaminskas again insisted that he could not truthfully answer the question in the affirmative based on what he heard secondhand. So when Kaminskas asked the question again, Mervilus finally relented by changing his answer to a "no."

Ultimately, Kaminskas concluded Mervilus was being deceptive when he denied responsibility for the crime. Kaminskas partly relied on a software program to analyze Mervilus's polygraph recordings, and that program indicated "probable deception." However, the only relevant question where Mervilus's physiological responses signaled deception

9

was for R3K—the question for which Kaminskas insisted Mervilus change his answer.

Kaminskas operated his polygraph practice with no oversight from the Police Department. When he examined Mervilus, the Department had no policies or procedures related to polygraph tests. The Department's then-Chief, Daniel Vaniska, conceded he had only a "basic understanding" of polygraphs at the time of Mervilus's examination. A1304–05. Kaminskas's examinations were never peer-reviewed by Police Department personnel or others in the field. And he had sole discretion on where he received continuing education. Thus, Kaminskas relayed to the prosecution his conclusion that Mervilus was lying without anyone checking his work.

Mervilus stood trial in 2008. At it, Abreu failed to identify him, pointing instead to a different Black man. But in line with Mervilus and Union County's stipulation, the Court admitted the polygraph exam done by Kaminskas and permitted him to testify. He stated that "innocent" examinees will react differently to certain questions than "a person [who] actually did the crime," A1509–12, and those who "react more to [r]elevant [q]uestions on a test" are lying. A1511. He further asserted he never had a confirmed mistake on a test.

Because the stipulation provided that Kaminskas would be the only polygraph expert to testify, Mervilus was not able to challenge that testimony meaningfully. Ultimately, the jury found him guilty of first-degree robbery, second-degree aggravated assault with intent to cause serious bodily injury, and third-degree aggravated assault with a deadly weapon. The Court sentenced him to eleven years in prison.

10

However, after several years' imprisonment, Mervilus successfully overturned his conviction. *State v. Mervilus*, 12 A.3d 258 (N.J. Super. Ct. App. Div. 2011). The New Jersey Superior Court, Appellate Division, held Kaminskas's testimony was improper and prejudicial. *Id.* at 262–64. It remanded the case for a new trial, requiring the State to establish the polygraph evidence's reliability prior to introducing it at trial. *Id.* at 264. That didn't occur because, when the State re-tried Mervilus, it did not seek to admit the polygraph evidence or have Kaminskas testify. Again, the victim did not identify Mervilus. And after a mere thirty minutes of deliberation, the jury acquitted him.

In 2014, Mervilus sued Kaminskas, Chief Vaniska in his personal capacity, Union County, and other now-dismissed defendants under 42 U.S.C. § 1983 and the New Jersey Civil Rights Act, N.J.S.A § 10:6-1. Mervilus claimed Kaminskas fabricated the polygraph evidence and falsely testified at trial, Vaniska and the County failed to train and supervise Kaminskas, and the County had a policy, practice, or custom of conducting polygraphs in a manner that caused an unreasonable risk of Fourth and Fourteenth Amendment deprivations.[3]

The United States District Court for the District of New Jersey granted summary judgment for Kaminskas, Vaniska, and the County. *Mervilus v. Union Cnty.*, No. 14-cv-7470, 2021 WL 4963293 (D.N.J. Oct. 26, 2021). Looking first to the claim against Kaminskas, the Court concluded the evidence

---

[3] The District Court previously dismissed additional claims in the complaint, and Mervilus does not appeal those dismissals.

11

suggested only that his polygraph methods were flawed and results incorrect, not that he acted in bad faith—an element of the fabrication claim. *Id.* at \*5–10. After holding the evidence failed to support the claim against Kaminskas, the Court granted Vaniska and Union County's motion without analyzing the merits of the claims against them. In its view, because Mervilus did not show "evidence to establish that Kaminskas committed a constitutional violation, [his] *Monell* claims against the Union County Defendants must fail." *Id.* at \*11. The Court did not analyze the individual claims against Vaniska. This appeal followed.

## II.      **Jurisdiction & Standard of Review**

The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1367 because, for the former, Mervilus brought claims under 42 U.S.C. § 1983 and, for the latter, the pendent state law claims falling under the district courts' supplemental jurisdiction. We have appellate jurisdiction under 28 U.S.C. § 1291.

We give a fresh review to a district court's entry of summary judgment. *Ellis v. Westinghouse Elec. Co., LLC*, 11 F.4th 221, 229 (3d Cir. 2021). We must "view the record and draw inferences in a light most favorable to the non-moving party," *In re IKON Office Solutions, Inc.*, 277 F.3d 658, 666 (3d Cir. 2002), and ask if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). For us to affirm, we must conclude that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

12

### III.   Analysis

We turn to the merits.  First, is the evidence sufficient for Mervilus to try his fabrication claim against Kaminskas? In answering this question, we clarify the state of mind necessary to sustain that claim.   Second, we decide if Mervilus's *Monell* claims against Union County are viable if Kaminskas is ultimately found not liable.[4]

#### A. A Reasonable Jury Could Find Kaminskas Fabricated Evidence.

"[I]f a defendant has been convicted at a trial at which the prosecution has used fabricated evidence, the defendant has a stand-alone claim under section 1983 based on the Fourteenth Amendment."  *Halsey v. Pfeiffer*, 750 F.3d 273, 294 (3d Cir. 2014).   That Amendment is the constitutional source of a fabrication claim for two reasons.   First, its due process guarantee ensures criminal defendants a fair trial. *See Black v. Montgomery Cnty.*, 835 F.3d 358, 370 (3d Cir. 2016) ("Fabricated evidence is an affront to due process of law, and state actors seeking to frame citizens undermine fundamental fairness and are responsible for 'corruption of the truth-seeking

---

[4]    The New Jersey Civil Rights Act is "interpreted analogously to § 1983," so Mervilus's claims under that statute rise and fall with his parallel § 1983 claims.  *Est. of Roman v. City of Newark*, 914 F.3d 789, 796 n.5 (3d Cir. 2019).  Thus, the District Court did not analyze those claims separate from the § 1983 claims, and we do the same.

function of the trial process.'" (quoting *United States v. Agurs*, 427 U.S. 97, 104 (1976))). Second, it guards against unlawful seizures post-conviction. *See Halsey*, 750 F.3d at 291 (explaining that the Fourth Amendment protects liberty interests only until trial, and the Fourteenth Amendment protects against unlawful seizures "through and after trial.").

For Mervilus to withstand Kaminskas's motion for summary judgment, he must bring "persuasive evidence supporting a conclusion that [Kaminskas was] aware that evidence is incorrect or that [it was] offered in bad faith." *Black*, 835 F.3d at 372 (quoting *Halsey*, 750 F.3d at 295 (internal quotation marks omitted)). Evidence is not fabricated if it "is incorrect or simply disputed." *Halsey*, 750 F.3d. at 295. Were it otherwise, every acquittal could spawn a fabrication claim. Because this intent requirement is stringent, "it will be an unusual case in which a police officer cannot obtain a summary judgment in a civil action charging him with having fabricated evidence." *Id.*

### 1. "Bad Faith" Includes Willful, Knowing, and Reckless Fabrication.

We have yet to clarify the scope of "bad faith" in the fabrication context. Obviously it encompasses the knowing or willful submission of false evidence. *See Fabricate*, MERRIAM WEBSTER'S THIRD NEW INT'L DICTIONARY (1993) ("3a: Invent, Formulate: Create; 3b(1): to make up with intent to deceive (2): Forge."); *Fabricate*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("4. To invent, forge, or devise falsely."). But does it include recklessly submitting that evidence?

Recall that the fabrication claim stems from the Fourteenth Amendment's guarantee of due process, which ensures individuals are not unlawfully deprived of liberty after a fundamentally unfair trial. In other contexts where the law protects those interests, recklessness is enough. Consider, for example, claims by persons alleging they were unlawfully seized based on a warrant obtained through the affiant's false statements. A plaintiff bringing this claim must show "(1) that the [affiant] 'knowingly and deliberately, *or with a reckless disregard for the truth*, made false statements or omissions that create a falsehood in applying for a warrant'; and (2) that 'such statements or omissions are material, or necessary, to the finding of probable cause.'" *Wilson v. Russo*, 212 F.3d 781, 786–87 (3d Cir. 2000) (emphasis added) (quoting *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997)). The same standard applies to a malicious-prosecution claim, which requires the plaintiff to prove he, among other things, suffered a deprivation of liberty from a prosecution brought with a reckless disregard for the truth in determining probable cause. *See Geness v. Cox*, 902 F.3d 344, 356–57 (3d Cir. 2018).

It would be anomalous to treat recklessness as sufficient in those contexts, but not here. An individual who furnishes inculpatory evidence while consciously disregarding a substantial risk it is false behaves culpably, heightens the risk of a wrongful conviction, and "offends some principle of justice so rooted in the traditions and conscience of our people to be ranked as fundamental." *Medina v. California*, 505 U.S. 437, 446 (1992) (cleaned up). So we rule that Mervilus's fabrication-of-evidence claim requires persuasive evidence Kaminskas formulated or submitted false evidence willfully, knowingly, or with a reckless disregard for its truth.

15

## 2.  There is Sufficient Evidence
## Kaminskas Acted in Bad Faith.

Having clarified the state of mind necessary to make out a fabrication claim, we now review whether Mervilus submitted enough evidence for a jury to find the standard met. We begin by noting evidence Kaminskas adhered to the Arther method despite red flags as to its validity and reliability. By the time he conducted Mervilus's examination, Kaminskas had read a National Academy of Science report concluding polygraph science was neither valid nor reliable. A reasonable polygraphist might then attempt to ensure the method he or she employs is sound. But Kaminskas admitted he never saw any support for many of the Method's teachings. Indeed, he did not follow some of what it taught. From this a jury could conclude he knew that polygraph science was generally suspect, and his approach especially so. Yet he proceeded with it anyway.

A jury might also find that, in examining Mervilus, Kaminskas failed to adhere to accepted practices in the field of polygraphy that are instituted to avoid bias against innocent suspects. Recall he instructed Mervilus to change his answer for a single question, R3K, the one that triggered physiological reactions purportedly indicating deception. Mervilus's expert, Dr. Honts, stated this technique "was highly likely to cause Mr. Mervilus to have large physiological reactions," and the question "posed a substantial risk of skewing the examination results against an actually innocent subject." A425. Kaminskas's expert, Dr. Palmatier, did not address this point.

16

So the notion that Kaminskas neglected standard practices designed to avoid false positives stands unrebutted and may prove persuasive to a jury.

In addition, a jury could conclude Kaminskas acted in bad faith when he reported Mervilus was lying because neither expert concurred with Kaminskas's conclusion that the data from Mervilus's exam suggested deception. Dr. Honts explained the physiological data strongly indicated Mervilus was being truthful in asserting his innocence. Dr. Palmatier, on the other hand, asserted the results supported a conclusion of "Deception Indicated" *or* "Inconclusive." Critically, an "inconclusive" result would not have been admissible evidence under the stipulation. *See* A1799 ("[I]nconclusive results shall not be introduced into evidence."). Thus, neither expert fully adopted Kaminskas's conclusion that the physiological data proved Mervilus was lying.

Considering the evidence holistically, we hold Mervilus brought sufficient evidence that Kaminskas fabricated his polygraph examination. This is so because, viewing the evidence in the light most favorable to Mervilus, Kaminskas had reason to doubt his method's validity and reliability, used biased techniques to examine Mervilus, and rendered a conclusion not compelled by the data. So we disagree with the District Court's observation that the evidence merely "suggests that Kaminskas knew superior polygraph methods may have existed." A22–30. Although knowingly employing an inferior method does not *per se* amount to a constitutional violation, we do not perceive Mervilus's argument to be that Kaminskas behaved culpably for not using some other, superior method. We thus vacate the District Court's summary judgment for Kaminskas and remand for further proceedings consistent with this opinion.

17

### 3. Kaminskas Does Not Have Qualified Immunity.

After holding Mervilus's claim against Kaminskas failed, the District Court did not address qualified immunity. Because the record is sufficiently developed, we do so now. *See Beers-Capitol v. Whetzel*, 256 F.3d 120, 126 n.1 (3d Cir. 2001) (reaching qualified immunity on appeal from a decision that did not reach the issue); *Est. of Smith v. Marasco*, 318 F.3d 497, 511 (3d Cir. 2003) (refusing to reach qualified immunity "in recognition that the record is unclear as to the relationship between each defendant's specific conduct and the rights at issue").

The right at issue is the due process protection against criminal investigators' fabrication of inculpatory evidence against a defendant. Prior to the events in question, that right had long been recognized by the Supreme Court and Courts of Appeal, including this one. *Pyle v. Kansas*, 317 U.S. 213, 216 (1942); *Mooney v. Holohan*, 294 U.S. 103 (1935) (per curiam); *Halsey v. Pfeiffer*, 750 F.3d 273, 295 (3d Cir. 2014); *U.S. ex rel. Moore v. Koelzer*, 457 F.2d 892, 893 (3d Cir. 1972); *Devereaux v. Abbey*, 263 F.3d 1070, 1075 (9th Cir. 2001); *Zahrey v. Coffey*, 221 F.3d 342, 349 (2d Cir. 2000); *Ricciuti v. NYC Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997); *Geter v. Fortenberry*, 849 F.2d 1550, 1559 (5th Cir. 1988); *Anthony v. Baker*, 767 F.2d 657, 662 (10th Cir. 1985). Thus, because a jury may find that Kaminskas fabricated the polygraph evidence, we cannot conclude he is immune from suit.

18

B.  Union County May Be Liable Even if Kaminskas Did Not Fabricate Evidence.

Mervilus claims his wrongful conviction stems from two Union County policies, practices, or customs.  First, he asserts the County was deliberately indifferent to his constitutional rights by failing to train or supervise Kaminskas.  Second, Mervilus alleges it maintained a policy of convincing suspects to stipulate to polygraph exams, conducting those exams in a biased way, and then using the skewed results to convict them wrongfully.

After holding that no reasonable jury could find Kaminskas liable on the evidence Mervilus presented, the District Court rejected his *Monell* claims without reviewing the merits.  In its view, "[b]ecause [he] has not adduced evidence to establish that Kaminskas committed a constitutional violation, his *Monell* claims . . . must fail."  A35.  We disagree.

"[A] municipality can be held liable under *Monell*, even when its officers are not, unless such a finding would create an *inconsistent* verdict."  *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 305 (7th Cir. 2010) (emphasis in original).  Where it is possible for the *Monell* defendant to cause constitutional harm without any individual defendant violating the plaintiff's rights, it is not inconsistent for a jury to find only the *Monell* defendant liable.  *See Speer v. City of Wynne*, 276 F.3d 980, 985–86 (8th Cir. 2002) ("[S]ituations may arise where the combined actions of multiple officials or employees may give rise to a constitutional violation, supporting municipal liability, but where no one individual's actions are sufficient to establish personal liability for the violation.");

19

*Fairley v. Luman*, 281 F.3d 913, 917 (9th Cir. 2002) ("If a plaintiff establishes he suffered a constitutional injury *by the City*, the fact that individual officers are exonerated is immaterial to liability under § 1983." (emphasis in original)); *Barrett v. Orange Cty. Human Rights Comm'n*, 194 F.3d 341, 350 (2d Cir. 1999) ("[U]nder *Monell*[,] municipal liability for constitutional injuries may be found to exist even in the absence of individual liability, at least so long as the injuries complained of are not solely attributable to the actions of named individual defendants."). But where a finding for the individual defendant necessarily means the plaintiff suffered no constitutional deprivation, there is no basis for a *Monell* claim, and thus it too must fall. *See Mulholland v. Gov't Cnty. of Berks, Pa.*, 706 F.3d 227, 238 n.15 (3d Cir. 2013) ("It is well-settled that, if there is no violation in the first place, there can be no *derivative* municipal claim.") (emphasis added).

Here, it would be consistent for the jury to find Kaminskas not liable because he lacked bad faith in conducting the exam, while simultaneously holding the County liable for failing to train or supervise him. *Cf. Fagan v. City of Vineland*, 22 F.3d 1283, 1292 (3d Cir. 1994) ("It is easy to imagine a situation where an improperly trained police officer may be ignorant of the danger created by his actions and inflicts injury."). Thus, Mervilus may ultimately prevail on his failure to train and supervise theory against Union County even if Kaminskas avoids liability. On the other hand, Mervilus's second *Monell* theory— that the County customarily fabricated exams—depends on Kaminskas being complicit in that scheme, and thus would be untenable if the jury finds for Kaminskas.

To be clear, our analysis is limited to determining whether either of Mervilus's *Monell* theories depends on his claim against Kaminskas. We express no view on whether his claims based on these theories are triable. The result is a remand for the District Court to decide in the first instance as to Union County.

\* \* \*

A reasonable jury could find Kaminskas fabricated the polygraph exam. We therefore vacate and remand the District Court's summary judgment for him. We also vacate and remand its summary judgment for Union County on the *Monell* claims.[5]

---

[5] For the District Court's benefit on remand, we clear up additional points of confusion. Mervilus brought counts 2, 3, 5, and 6—each alleging unconstitutional polygraph policies, practices, or customs and the failure to train and supervise Kaminskas—against Vaniska and Union County. But only counts 2 and 5 are styled as *Monell* actions. This matters for two reasons. First, Mervilus sued Vaniska in his personal capacity, and thus he is an improper *Monell* defendant. We therefore affirm the District Court's summary judgment for Vaniska on counts 2 and 5 only; we vacate and remand on counts 3 and 6 with no view expressed on the merits. Second, because a *Monell* claim is the way to sue municipalities, we affirm the summary judgment for Union County on counts 3 and 6, which, to repeat, are not *Monell* claims.