**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-5435-10T2
                    A-1459-11T2
                    A-2138-11T3
                    A-3256-11T2
                    A-1385-15T2

J.B.,

    Appellant,

v.

NEW JERSEY STATE PAROLE BOARD,

    Respondent.

_____

L.A.,

    Appellant,

v.

NEW JERSEY STATE PAROLE BOARD,

    Respondent.

_____

B.M.,

    Appellant,

v.

NEW JERSEY STATE PAROLE BOARD,

    Respondent.

_____

**APPROVED FOR PUBLICATION**

**January 21, 2016**

**APPELLATE DIVISION**

W.M.,

    Appellant,

v.

NEW JERSEY STATE PAROLE BOARD,

    Respondent.

_____

R.L.[1],

    Appellant,

v.

NEW JERSEY STATE PAROLE BOARD,

    Respondent.

_____

        Argued October 29, 2013 - Referred to the Law Division pursuant to Rule 2:5-5(b) November 26, 2013
        Reargued September 16, 2015 - Decided January 21, 2016

        Before Judges Sabatino, Accurso, and O'Connor.

        On appeal from the New Jersey State Parole Board.

        Michael C. Woyce argued the cause for appellants L.A., W.M. and R.L.[2] (Murphy &

---

[1] By consent of counsel for the parties and intervenor, a separate appeal by R.L. raising similar issues was consolidated with the present appeals in December 2015, and all parties agreed to rely as to R.L. on their briefs and oral arguments they had previously presented.

[2] At oral argument in October 2013 and again in September 2015, counsel represented that the issues relating to J.B. and B.M.,

                                    (continued)

A-5435-10T2

Woyce, attorneys; Joseph S. Murphy, Jesse D. Stovin, and Mr. Woyce, on the briefs).

Daniel M. Vannella, Deputy Attorney General, argued the cause for respondent (John J. Hoffman, Acting Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel and on the brief; Mr. Vannella and Christopher C. Josephson, Deputy Attorney General, on the briefs).

Fletcher C. Duddy, Deputy Public Defender, argued the cause for Intervenor New Jersey Public Defender (Joseph E. Krakora, Public Defender, attorney; Mr. Duddy and Stefan J. Erwin, Assistant Deputy Public Defender, on the brief).

The opinion of the Court was delivered by

SABATINO, P.J.A.D.

This matter returning to our court involves a challenge to the practices of the New Jersey State Parole Board ("Parole Board") in administering polygraph examinations. Pursuant to statutory and regulatory authority, the Parole Board periodically administers such polygraphs to released sex offenders who are subject to either parole supervision for life ("PSL") or its statutory predecessor, community supervision for life ("CSL"), N.J.S.A. 2C:43-6.4.

_____

(continued)
are no longer in dispute and that the appeals are proceeding solely as to L.A., W.M., and R.L.

Appellants, all of whom are represented by the same counsel, are individuals who have been convicted of sexual offenses, have completed their respective prison terms, and are now being monitored by the Parole Board as part of the terms of their PSL or CSL. Appellants contend that the Parole Board's practices of requiring them and other similarly-situated offenders[3] subject to PSL or CSL to submit to polygraphs, and the manner in which it uses those polygraph results, violate their constitutional rights. They also contend that the Parole Board's practices in this regard are arbitrary and capricious and should be invalidated on that basis as well.

For reasons that follow, we uphold the validity of the Parole Board's polygraph program, subject to certain important conditions and modifications. In particular, we disallow the Parole Board from using the machine-generated technical results of such exams as evidence to justify a curtailment of an offender's activities. We also rule the Parole Board's regulations and practices to protect the offenders' privileges against self-incrimination should be enhanced.

Appellants' polygraph challenges were included in an earlier phase of these consolidated appeals that also included appellants' separate claim that the Parole Board had

---

[3] Appellants have not sought class certification.

unconstitutionally restricted their access to social media and other websites on the Internet.

In November 2013, this court issued an opinion that partially adjudicated the issues presented. J.B. v. N.J. State Parole Bd., Nos. A-5435-10, A-1459-11, A-2138-11, A-2448-11, A-3256-11 (App. Div. Nov. 26, 2013) ("J.B. I"). In the published portion of that opinion in J.B. I, we rejected appellants' facial challenge to the Internet access restrictions, without prejudice to the ability of individual offenders to pursue "as-applied" challenges to such restrictions in the future. See J.B. v. N.J. State Parole Bd., 433 N.J. Super. 327, 344-46 (App. Div. 2013), certif. denied sub nom., B.M. v. N.J. State Parole Bd., 217 N.J. 296 (2014).

In the unpublished portion of our November 2013 opinion, we declined to resolve appellants' challenges to the Parole Board's use of polygraph examinations. We did so because the factual record at that time was inadequate to evaluate whether the Parole Board's practices violate appellants' constitutional rights or are arbitrary and capricious. J.B. I, supra, slip op. at 28-50. Given the record's shortcomings and the exceptional circumstances of this case, we referred the polygraph issues to the trial court for evidentiary hearings and fact-finding pursuant to Rule 2:5-5(b). Id. at 48-50.

As part of the referral for fact-finding, we directed the trial court to "explore the existence and strength of what the [Parole Board] asserts are the therapeutic, rehabilitative, and risk management benefits of polygraph examinations as administered to released sex offenders." Id. at 47. We also requested the trial court to indicate, to the extent possible, any recommendations it may have concerning how the Parole Board's existing procedures "might be altered to (1) enhance any proven therapeutic, rehabilitative or risk management benefits of the polygraph testing; or (2) achieve those benefits in a manner that might be less intrusive of appellants' individual rights." Id. at 49-50.

Following discovery and the exchange of expert reports, the evidentiary hearings were conducted in the fall of 2014 over the course of six intermittent dates. With our permission, the State Office of the Public Defender, which had previously commented on the Parole Board's polygraph regulations when they were adopted, intervened in the proceedings and presented its own expert proofs. Multiple experts and fact witnesses testified at these hearings. The trial court also considered a plethora of exhibits and written studies on the subject.

On January 12, 2015, the trial court issued lengthy written findings of fact. In its conclusions, the court found what it

termed a "reasonable basis" for the Parole Board to use polygraph testing in the supervision and treatment of sex offenders on PSL or CSL. However, consistent with the constraints of our referral and Rule 2:5-5(b), the court confined its decision to factual findings, and it did not address the constitutionality or legal validity of the polygraph testing program.

Appellants subsequently filed exceptions to the court's factual findings, and also renewed their legal arguments supporting their challenge. The Public Defender likewise filed exceptions and also advanced its own legal arguments, urging that we invalidate the polygraph testing program. The Parole Board filed a written response and the legal issues were reargued before this court, this time with the participation of the Public Defender.

Having now considered these issues with the benefit of the court's detailed fact-finding, we reach several conclusions, which are amplified more fully in this opinion. First, we reject appellants' categorical attempt to invalidate all polygraph testing conducted by the Parole Board. We find ample support in the record for the trial court's finding that such testing can assist parole officers and treatment professionals in making better-informed decisions as to supervision and

treatment. However, in recognition of our judiciary's long-standing concerns about the inaccuracy of the machine-generated results produced by polygraph testing, we conclude that the Parole Board may not utilize such "technical" results in any evidential manner to support imposing sanctions or increased restrictions on the monitored individuals. This proviso does not, however, preclude the Parole Board from making evidential use of the substance of any admissions or other statements made by the offenders at a polygraph session, as distinguished from the machine-generated technical results.

Second, we hold that the Parole Board must enhance its regulations and practices to safeguard an offender's right to invoke his constitutional privilege against self-incrimination in responding to any questions posed before or during a polygraph examination session. We reject, however, appellants' specific claim that the polygraph sessions comprise a form of custodial interrogation that require the administration of Miranda[4] warnings.

---

[4] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

The following background derived from both the extensive factual record and the overall regulatory scheme informs our analysis of the constitutional and legal issues.[5]

### The Court's Long-standing Aversion to the Evidential Use of Polygraphs

For decades, our courts have declared machine-generated polygraph results to be unreliable proof that must be excluded as evidence, unless there is a mutual stipulation from the parties agreeing to admit such proof. See, e.g., State v. A.O., 198 N.J. 69, 83-84 (2009); State v. Domicz, 188 N.J. 285, 312-13 (2006); State v. McDavitt, 62 N.J. 36, 43-44 (1972); State v. Driver, 38 N.J. 255, 261 (1962). As part of that unbroken line of precedent, our State Supreme Court explained in McDavitt in 1972 that "[t]o date . . . lie detector testing has not yet attained scientific acceptance as a reliable and accurate means of ascertaining truth or deception." McDavitt, supra, 62 N.J. at 44. In 2006, the Court reiterated the polygraph's scientific unreliability and inaccuracy in Domicz, observing that "[i]n the more than thirty years since McDavitt, serious questions about

---

[5] Much of this background repeats, at times verbatim, the unpublished portion of our November 2013 opinion in J.B. I, as corrected or amplified by additional information that emerged at the trial court proceedings. To the extent there is any variation with our prior opinion, the details in our present opinion supersede our earlier discussion.

the reliability of polygraph evidence remain." Domicz, supra, 188 N.J. at 313.

In 2009 in A.O., the Court repeated these well-settled principles, holding that polygraph evidence generated after a stipulation entered into between the State and a criminal suspect — without the involvement of the suspect's defense counsel — is inadmissible at trial. A.O., supra, 198 N.J. at 90. Among other things, the Court in A.O. referred again to the abundant scientific literature that raises doubts about the reliability and accuracy of polygraph results. Id. at 83-84; see also United States v. Scheffer, 523 U.S. 303, 309-12, 118 S. Ct. 1261, 1265-66, 140 L. Ed. 2d 413, 419-21 (1998). As of the time of the Court's 2009 opinion in A.O., twenty-eight states had banned the admission of polygraph evidence outright. A.O., supra, 198 N.J. at 84. The Court noted that "[v]irtually all the other states" that have considered the issue "limit the admission of polygraph evidence to cases where both parties stipulate to its use." Id. at 85. As the Court in A.O. unambiguously declared, "[t]his Court has not sanctioned and does not now entertain the admission of polygraph results." Id. at 86.

<u>The Legislature's Authorization to the
Parole Board to Administer Polygraphs for
"Treatment" and "Risk Management" of PSL/CSL
Sex Offenders</u>

Despite this long-standing precedent treating non-stipulated polygraph results as inadmissible in our courts, the Legislature adopted the following provision in 2005 authorizing polygraph testing of offenders who are subject to PSL or CSL. This statute is part of a larger set of provisions addressing the post-release supervision of persons convicted of certain sexual offenses. In pertinent part, the statute provides:

> The State Parole Board, <u>on at least an annual basis, may administer</u> to all offenders serving a special sentence of community or parole supervision for life, imposed pursuant to section 2 of <u>P.L.</u> 1994, <u>c.</u> 130 ([<u>N.J.S.A.</u>] 2C:43-6.4), <u>polygraph examinations in order to obtain information necessary for risk management and treatment and to reduce the offender's denial mechanisms</u>. A polygraph examination shall be conducted by a polygrapher trained specifically in the use of the polygraph for the monitoring of sex offenders, where available, and shall be paid for by the offender. <u>The results of the polygraph examination shall not be used as evidence in court to prove that a violation of the special sentence of community or parole supervision for life or condition of discharge has occurred</u>.
>
> [<u>N.J.S.A.</u> 30:4-123.88 (emphasis added).]

As part of this polygraph initiative and the related provisions allowing electronic monitoring and other restrictions of sex offenders on PSL or CSL, the Legislature articulated the following general purposes to improve, with the aid of technology, the post release monitoring of sex offenders:[6]

> a. Offenders who commit serious and violent sex crimes have demonstrated high recidivism rates and, according to some studies, are four to five times more likely to commit a new sex offense than those without such prior convictions, thereby posing an unacceptable level of risk to the community.
>
> b. Intensive supervision of serious and violent sex offenders is a crucial element in both the rehabilitation of the released inmate and the safety of the surrounding community.
>
> c. Technological solutions currently exist to provide improved supervision and behavioral control of sex offenders following their release.
>
> d. These solutions also provide law enforcement and correctional professionals with new tools for electronic correlation of the constantly updated geographic location of supervised sex offenders following their release with the geographic location of

---

[6] Contemporaneous with the passage of N.J.S.A. 30:4-123.88, the Legislature issued these findings and declarations that were applicable to the subchapter. L. 2005, c. 189, § 2. A later amendment in 2007 recodified those same findings and declarations to its current form, N.J.S.A. 30:4-123.90. L. 2007, c. 128, § 8.

reported crimes, to possibly link released offenders to crimes or to exclude them from ongoing criminal investigations.

e. Continuous 24 hours per day, seven days per week, monitoring is a valuable and reasonable requirement for those offenders who are determined to be a high risk to reoffend, were previously committed as sexually violent predators and conditionally discharged, or received or are serving a special sentence of community or parole supervision for life. A program to monitor these sex offenders should be established.

[L. 2007, c. 128 (emphasis added); see also N.J.S.A. 30:4-123.90.]

### The Parole Board's Development of Polygraph Testing Procedures and Regulations

The Parole Board then undertook to develop procedures and regulations to implement the polygraph testing the Legislature authorized in N.J.S.A. 30:4-123.88. See N.J.A.C. 10A:71-6.11(b)(21); N.J.A.C. 10A:72-3.1 to -3.10. Those regulations and procedures are at the heart of the legal challenges advanced here by appellants and the intervenor Public Defender.

In objection to the Parole Board's initial set of proposed polygraph regulations, the Public Defender's Office questioned the reliability and utility of the device. That comment from the Public Defender was summarized by the Parole Board in the New Jersey Register:

The section requiring convicted sex offenders to submit to an annual polygraph

examination at their expense is <u>both unfair and an extremely unreliable tool</u>. The fact that the section (<u>N.J.A.C.</u> 10A:71-6.13(b)) provides for a polygrapher specially trained in the use of the polygraph for monitoring of sex offenders highlights this proposition. If the polygraph examination was a <u>reliable</u> tool for determining deception, any qualified polygrapher would be equally capable of determining deception, whether the issue was taking money from a bank or continued interest in deviant sex. The commenter viewed the proposed new rule as just another step to make the lives of sex offenders in this State unbearable <u>with no public benefit</u>.

[40 <u>N.J.R.</u> 3726(b) (emphasis added).]

In response to that comment, the Board rested upon the Legislature's own findings:

New rule <u>N.J.A.C.</u> 10A:71-6.13 (Polygraph examinations) codified <u>N.J.S.A.</u> 30:4-123.88, [a statute] which was enacted effective August 11, 2005. As the language of the new rule is the same as the statutory language, the State Parole Board elected to adopt <u>N.J.A.C.</u> 10A:71-6.13 as proposed.

[<u>Ibid.</u>]

Because certain provisions in the proposed regulations, as initially drafted, seemed to incorrectly mandate that the Parole Board administer polygraph examinations on an annual basis to all sex offenders, the Parole Board subsequently issued a rule amendment. Consistent with <u>N.J.S.A.</u> 30:4-123.88, the amendment clarified the discretionary nature of its polygraph testing to

make it plain that the testing is not a universal or annual requirement. N.J.A.C. 10A:71-6.11(b)(21).

Subsequently, one of the appellants in this case, B.M., filed an appeal challenging the validity of the Parole Board's practices in administering such polygraphs. In ruling on that appeal in 2010, we did not address the merits of B.M.'s constitutional arguments. Instead, we directed the Parole Board to undertake additional formal rulemaking to codify its internal practices in accordance with the rulemaking principles of Metromedia, Inc. v. Dir., Div. of Taxation, 97 N.J. 313 (1984). B.M. v. N.J. State Parole Bd., No. A-2599-09 (App. Div. June 30, 2010) (slip op. at 6-8).

Consequently, in January 2011, the Parole Board proposed additional polygraph regulations, in an effort to address the need for rulemaking identified in our 2010 opinion. 43 N.J.R. 121(a). The bulk of those rule amendments, which were adopted in July 2011, are now set forth in N.J.A.C. 10A:72-3.1 to -3.10.[7]

During the public comment process concerning these proposed clarifying rules, the Public Defender as well as a group of individual offenders (none of whom are parties to the

---

[7] The proposal also sought to amend N.J.A.C. 10A:71-6.11(b)(21) to clarify that an Assistant District Parole Supervisor or a Supervising Parole Officer may also direct an offender to submit to a polygraph examination.

consolidated appeals presently before this court) submitted objections to the Parole Board.  The objectors criticized the proposed new provisions on a variety of constitutional and legal grounds, all of which are now before us in the current appeals. As the Parole Board summarized those objections:

> The comments submitted by the group of offenders related to their concern that polygraph examinations have been found to be unreliable; that based on a process found to be unreliable an offender may be subject to a course of action that would result in the loss of liberty; that an offender would be forced to give up his right to remain silent; and that as parole is part of the criminal process an offender's submission for a polygraph examination would violate his right to be represented by counsel.
>
> [43 N.J.R. 3087(a) (emphasis added).]

The Parole Board rejected all of the objectors' claims of unconstitutionality in its published response.  Ibid.  Except for certain revisions to the notice requirements in N.J.A.C. 10A:72-3.5, the Parole Board adopted the newest rules in otherwise substantively-unchanged form on July 27, 2011, effective November 21, 2011.  Ibid.; see generally N.J.A.C. 10A:72-3.1 to -3.10.  These newer regulations implemented the more general authorization set forth in N.J.A.C. 10A:71-6.13. That regulation, in turn, tracks the enabling statute, N.J.S.A. 30:4-123.88, almost verbatim, and reads:

(a) . . . [T]he Board, on at least an annual basis, may administer to all offenders serving a special sentence of community or parole supervision for life, imposed pursuant to N.J.S.A. 2C:43-6.4, polygraph examinations in order to obtain information necessary for risk management and treatment and to reduce the offender's denial mechanisms.

(b) A polygraph examination shall be conducted by a polygrapher trained specifically in the use of the polygraph for monitoring of sex offenders, where available, and shall be paid for by the offender.

(c) The results of the polygraph examination shall not be used as evidence in court to prove that a violation of the special sentence of community or parole supervision for life or condition of discharge pursuant to N.J.S.A. 30:4-27.36 has occurred.

[N.J.A.C. 10A:71-6.13 (emphasis added).]

## The Three Types of Polygraph Examinations Authorized by the Regulations

The Parole Board's regulations describe three kinds of polygraphs: (1) an "instant offense examination," (2) a "periodic maintenance examination," and (3) a "sexual history examination." N.J.A.C. 10A:72-3.3(a) to (c). An instant offense examination is proper when "either an offender denies guilt regarding the commitment offense or an offender's version of the commitment offense differs significantly from the

official version of the commitment offense as noted in the pre-sentence report."  N.J.A.C. 10A:72-3.3(a).

By comparison, a periodic maintenance examination, which appears to be much broader in scope, may be administered when it is needed "to verify the activities, behavior and truthfulness of an offender as related to compliance with the conditions of supervision."  N.J.A.C. 10A:72-3.3(b).

Lastly, the regulations note that the third kind of test, a sexual history examination[8] may be administered "to obtain comprehensive information regarding an offender's sexual interests and behaviors in order to identify the offender's predilections and to assist in case planning and treatment objectives."  N.J.A.C. 10A:72-3.3(c).

The decision as to whether any of these kinds of polygraphs should be administered to a particular offender serving a PSL or CSL sentence is initially considered by the individual's assigned parole officer.  The parole officer is to be guided by the following standards set forth in the regulations:

> The assigned parole officer shall review the
> offender's case with an Assistant District
> Supervisor, District Parole Supervisor, or
> Supervising Parole Officer for consideration
> of a polygraph examination, if the assigned

---

[8] The record before us indicates that the Parole Board has yet to administer a "sexual history examination" to any offender on PSL or CSL.

> parole officer has a reasonable belief that an offender is non-compliant with a condition(s) of supervision; if an offender denies guilt regarding the commitment offense; or if an offender's treatment provider believes that the administration of a polygraph examination would assist in the treatment or supervision of the offender. In addition, the reviewing supervisor must determine that there is a need to obtain and verify information regarding an offender's behaviors and sexual interests.
>
> [N.J.A.C. 10A:72-3.4(a) (emphasis added).]

The ultimate decision to administer a polygraph must be made by a supervisor. N.J.A.C. 10A:72-3.4(b). If a polygraph is ordered, the offenders are to be supplied with thirty days' advance notice of the procedure, N.J.A.C. 10A:72-3.5, and are presented with a disclosure form detailing the terms of the polygraph, N.J.A.C. 10A:73-3.6(a), including notification that "the results"[9] of the examination "shall not be used as evidence in court to prove that a violation of the [terms of PSL or CSL] or condition of discharge has occurred," N.J.A.C. 10A:72-3.6(b)(6). Failure to submit to a polygraph, absent good cause, is now a third-degree crime, as a result of a change in the law in 2013. N.J.S.A. 2C:43-6.4(d).

---

[9] See our discussion, infra in Part III, concerning the meaning of the term "results" and the implications of that definition.

The polygraph session consists of a pre-examination interview, the examination itself, and a post-examination interview. N.J.A.C. 10A:72-3.7(a). During the post-examination interview, the examiner must review the test results with the offender, advise him or her of "any significant, deceptive or inconclusive response[s,]" and provide him or her with a chance "to explain or resolve any significant, deceptive or inconclusive response[s]." N.J.A.C. 10A:72-3.7(h)(2). The examiner is to immediately notify a supervisor or a supervisor's designee of "any significant findings, conclusions and/or admissions made during the polygraph examination process." N.J.A.C. 10A:72-3.8(a). The supervisor or designee, in turn, must review the individual's case "with the assigned parole officer and/or treatment provider to determine a course of action." N.J.A.C. 10A:72-3.9(a).

Notably, "any voluntary admission(s) made by the offender regarding unreported victim(s) or crime(s)" must be immediately reported to the appropriate law enforcement agencies. N.J.A.C. 10A:72-3.9(b). The costs of the examination must be paid for by the offender. N.J.A.C. 10A:72-3.10(a).

These testing procedures, as they are deployed in practice, were described in extensive detail by the Parole Board's witnesses at the trial court's evidentiary hearing. The

testimony reflects that to some extent, the Parole Board has altered its actual practices over time, even as the present litigation has been pending. The trial court accepted as expert witnesses all of the testifying witnesses who were designated as such by the parties and the Public Defender.

### The Parole Board's Factual and Expert Proofs

### Raymond Nelson

The Parole Board's chief factual and expert witness at the hearing was Raymond Nelson. Nelson is employed by a company that manufactures polygraph equipment used by the Parole Board. He holds a master's degree in psychology, and has extensive experience in both psychotherapy and statistical research. For more than a dozen years, Nelson has counseled both perpetrators and victims of sexual abuse. Consistent with guidelines promulgated by the American Polygraph Association ("APA"), Nelson trains other examiners who administer polygraphs to sex offenders. Such tests are also known as Post Conviction Sex Offender Testing ("PCSOT").

Nelson explained that polygraph testing operates on a premise that certain human physiological responses correlate with deception or truth-telling. The polygraph machine has electrodermal, cardiac, and respiration sensors designed to measure those responses as the subject answers questions

carefully formulated and arranged by the examiner. Appropriate questions, depending on the nature of the test and the subjects of inquiry, are ordinarily prepared prior to the exam session. The actual wording of the exam questions is finalized during the pre-test interview.

The Parole Board uses an examination technique validated by a 2011 APA "meta-analysis." As part of that technique, an examiner intersperses "target" (or relevant) questions among "control" questions and "neutral" questions. The examiner then evaluates any differences in the subject's physiological response to those stimuli to gauge the probability that he or she is engaging in deception. According to Nelson, subjects with stronger responses to relevant questions tend to be deceptive, while those with stronger responses to control questions tend to be telling the truth.

The polygraph machinery the Parole Board uses is equipped with somatic sensors, most commonly attached to the subject's chair. The sensors are designed to detect movement in any large muscle group in the body, for example, by identifying changes in distribution of weight on the chair. According to Nelson, the equipment can thus detect whether a subject is deliberately engaged in muscle tension or other known "countermeasures" to affect the results of the test. The examinations typically last

A-5435-10T2

an hour and a half, with most of that time devoted to the pre-test interview.

Nelson stated that polygraph testing had been used in the post-conviction context for decades and that nearly all states now used PCSOT in some manner. Nelson noted that some testing was performed for diagnostic purposes, such as the "instant offense" polygraphs authorized by N.J.A.C. 10A:72-3.3(a).

Other testing is primarily used for screening purposes, such as the "maintenance" polygraphs authorized under N.J.A.C. 10A:72-3.3(b), as to which appellants here have most strenuously objected. The purpose of such maintenance testing, Nelson explained, is threefold: (1) to increase the information available for treatment and supervision by encouraging disclosure; (2) to act as a deterrent to violation by encouraging compliance with the conditions of supervision; and (3) to aid those responsible for the offender's treatment and supervision in discriminating truth from deception.

Nelson cited research showing that the accuracy of PCSOT polygraphs ranged from a median of 89% for diagnostic tests to a median of 85% for screening tests such as maintenance polygraphs, which are more complicated to administer. He estimated the lower bound for accuracy of diagnostic tests at 83% and for screening polygraphs at 77%. Although polygraph

reliability is not perfect, Nelson contended that polygraph results nonetheless performed far better than chance predictions of truthfulness. He also claimed that the testing promoted better-informed decision-making by officials who are responsible for offender treatment and supervision.

Dr. Bosley

The Parole Board also presented testimony from Dr. Jackson Bosley, a licensed psychologist engaged in sex offender treatment. Dr. Bosley developed and now runs the Parole Board's treatment program for indigent sex offenders. He explained that his program adopted a collaborative approach, in which treatment professionals share information with parole officers. According to Dr. Bosley, such collaboration fosters more informed decision-making about treatment and monitoring. The collaboration thereby promotes rehabilitation and reduces recidivism among supervised parolees.

Dr. Bosley noted that the therapeutic process for sex offenders is typically an initially uncomfortable one. This is so because offenders participate in treatment only by mandate, and tend to view the clinician as an enemy tasked with probing the shameful behavior which led to the offender's conviction. Dr. Bosley estimated that, as a consequence, about half of sex offenders deny outright their offenses early in treatment, while

the other half usually remain silent.  The psychologist opined that an offender's overcoming denial and accepting culpability for his instant offenses is a crucial step in that individual's process.  Administering polygraphs aids that acceptance process, Dr. Bosley explained, because such tests encourage offenders to become more forthcoming with themselves and their treatment professionals, thus fostering rehabilitation.

Dr. Bosley recounted that often the mere scheduling of a polygraph examination motivates offenders to become more forthcoming and ultimately to accept responsibility for their behavior.  He asserted this phenomenon creates a therapeutic benefit that is not directly dependent on the accuracy of the testing itself.  He opined that some offenders would likely never accept that responsibility without being subjected to polygraph testing.

Captain Tallard

The Parole Board also presented testimony from Captain Steven Tallard, a supervising parole officer who has been deeply involved in the design and implementation of its PCSOT policies. By the time of Tallard's testimony in September 2014, the Parole Board had conducted a total of 1766 examinations pursuant to those policies, including 594 "instant offense" and 1172 "maintenance" exams.  Sexual history examinations had never been

25                                          A-5435-10T2

conducted, and there were no plans to begin administering any as of the time of the hearing.

In the course of discussing the requirements for testing set forth in the Parole Board's policies, Tallard confirmed that maintenance exams were not meant to be used to obtain identifying information of new crimes or unreported victims. He added that no offender currently under criminal investigation or whose case remained on appeal could be ordered to comply with a polygraph test. Instead, he asserted that the goal of such an exam was only to confirm or eliminate a parole officer's concerns as to whether the examinee had been complying with the conditions of his or her supervision. Thus, the Parole Board's policies require that an offender only be subject to the exam on a reasonable belief by the parole officer that the offender has been non-compliant. Tallard noted that an offender may leave an examination, but may be subject to adverse consequences to his or her conditions of supervision as a result of such non-compliance.

Tallard asserted that the Parole Board's decisions as to conditions of supervision have never been based exclusively on the technical results of an exam, but on a totality of the circumstances, including any basis for the exam referral. To the extent a published study conducted by Heather Carbone in

26

2009 suggested to the contrary, i.e., that the Parole Board may have made supervision decisions solely on the basis of technical exam results in the past, Tallard believed her report was inaccurate. He asserted that Carbone's survey failed to make clear what she meant by the term exam result, implying that Carbone's percentage figure included more than the machine-generated results.

### Sergeants Andresen and Cavanaugh

Sergeant Ryan Andresen, an assistant district parole supervisor and a certified polygraph examiner, further explained the agency's actual practices. Andresen has conducted about 150 polygraph exams. He noted that the polygraph techniques used by the Parole Board's examiners have evolved over time. Some "comparison" questions during the procedure have changed. Andresen asserted, however, that all techniques used have been validated by the APA. He also noted that each examiner is required to submit two exam reports per year for peer review.

Sergeant Kimberly Cavanaugh, a certified polygrapher who also has likewise administered about 150 examinations for the Parole Board, provided similar testimony. Cavanaugh is responsible for reviewing every request within the agency for offender examinations. She acknowledged that in the early years of the Parole Board's program, maintenance examinations could be

performed at a parole officer's request, merely as a "general compliance check." According to Cavanaugh, once the regulations and policies were changed, exam requests could no longer be approved without a reasonable suspicion of the offender's non-compliance with his conditions of release.

Cavanaugh explained that, prior to administering the polygraph, an examiner reviews information from the examinee's case history, including the pre-sentence report as well as treatment and supervision notes. The examiner does this to prepare for the interview and design the exam. The resultant exam questions, she cautioned, are meant only to explore the examinee's behavior in complying with conditions of supervision, and are not fashioned to uncover specific information about new criminal activity. Cavanaugh agreed with Tallard that an examinee is free to leave during an exam, but his refusal to take a polygraph or non-cooperation during the test could, although need not, lead to a parole violation.

Appellants' and Intervenor's Proofs

The expert and other witnesses who testified for appellants and the Public Defender countered these alleged positive aspects of the polygraph program. On the whole, they levied substantial criticisms about the reliability of the polygraph testing

results, as well as the fairness and consistency of the Parole Board's practices.

### Dr. Iacono

The chief opposing witness was Dr. William G. Iacono, a prominent polygraph critic, who is an expert in physiology and who has studied the scientific validity of polygraph testing. Dr. Iacono holds a doctoral degree in clinical psychology and psychophysiology. He has conducted psychophysiological research, including studies focused on the validity of polygraph testing, for more than forty years. He has published about twenty-five papers over the course of that career, and his work has been cited by our own Supreme Court and the Supreme Court of the United States.

Dr. Iacono explained that polygraph machines were designed simply to record physiological responses during the course of an exam. The device shows changes in activity such as heart and respiratory rates and blood pressure, but does not explain why such changes occurred. According to Dr. Iacono, no unique physiological activity is inherently indicative of deception. Hence, different individuals can be expected to produce different patterns of such activity while lying. As Dr. Iacono explained, the machines, which merely record those patterns, do not actually "detect lies."

Dr. Iacono substantially criticized the Parole Board's polygraph methodology. He noted that the agency's examiners have used control questions presumed to elicit a lie, so that the physiological response to those probable-lie questions can serve as a frame of reference (i.e., as a "control") for responses to the relevant questions. The assumption underlying this methodology is that an honest subject will deny a relevant question with no significant reaction, but have a stronger reaction when lying in response to the control question. A dishonest subject, on the other hand, would be expected to have a stronger reaction when lying in response to the relevant question than to the control. The questions are typically repeated in varying order so as to produce a response pattern that an examiner analyzes to gauge the subject's truthfulness. All of this rests on the assumption that honest and dishonest individuals will likely yield predictably different reaction patterns to control questions.

Dr. Iacono disagreed with this assumption. He noted that a subject who answers a control question truthfully might then react strongly only to a relevant question, falsely registering apparent deception. Dr. Iacono testified that he knew of no theoretical explanation for the assumption that a deceptive subject would respond more strongly to a relevant question.

Because control questions often carry a different level of accusation than relevant ones, he pointed out that a discrepancy in response between the two queries could be attributable to a poor pairing of questions, rather than to the subject's honesty. According to Dr. Iacono, a relevant question can be relevant for an honest examinee just as it is for a dishonest one, because he would recognize it as a question on which his "fate hangs." The truthful subject may then exhibit a strong reaction to the false accusation in that question, but due only to fear of the consequences of failing the test.

Dr. Iacono further expressed concerns with what he termed examiner bias. He noted that for instant offense exams, for example, the examiner begins with an assumption that the examinee is guilty, an assumption which then influences the formulation of test questions and compromises the integrity of the whole testing process.

To be sure, Dr. Iacono acknowledged that examiners do tend to be ethical and conscientious, and he agreed that a skilled examiner can minimize subjectivity in designing and administering the test and analyzing the results. Even so, he concluded that some unconscious bias by the examiner will always remain. Compounding the problem, Dr. Iacono added, is that polygraph examiners seldom have any opportunity to learn when

31

they have erred.  He faulted the Parole Board for not having implemented routine quality control measures, such as blind peer reviews of examiners.

Dr. Iacono underscored recent research addressing "contamination bias," a concept that had been illustrated by a segment on the television show "60 Minutes."  In that situation, a number of polygraph firms were assigned four individuals to test, identifying one among the four who was suspected of being guilty.  All four persons were actually innocent, but, in every case, the polygraph firm deemed the identified "suspect" to be deceptive.

Dr. Iacono also discussed research as to the accuracy of exams administered by the Royal Canadian Mounted Police in the 1980s.  The research showed that the polygraph results carried a strong bias against innocent persons, with an accuracy level for those individuals of only 57%, just slightly better than a 50/50 chance.  Dr. Iacono also stated that previous laboratory studies had revealed that dishonest individuals can confound the exam results with certain known countermeasures.

Based on his research, Dr. Iacono opined that the claims of accuracy by polygraph practitioners are exaggerated in general and for maintenance exams in particular.  He did acknowledge that polygraph testing can provide some "therapeutic benefit" to

32

certain individuals, including if testing encouraged them to overcome denial of their offenses. He doubted, however, that testing would carry such a benefit "across the board."

Dr. Iacono admitted that the Parole Board's expert, Dr. Bosley, was in a better position than he was to evaluate the impact of testing on the psychological treatment of the offenders the Parole Board monitors. However, Dr. Iacono cautioned that, if testing continues to be used, the technical results of the tests should never be dispositive of a parole supervision decision in isolation, but considered with all available relevant information in light of the fallibility of the device.

### Dr. Atkins

Appellants also presented Dr. Elliot Atkins, an expert in psychology with a focus on the assessment and treatment of sex offenders. Dr. Atkins holds a master's degree in clinical psychology and a doctorate in school psychology. He is licensed to practice psychology in New Jersey and Pennsylvania. He has extensive experience in clinical treatment of both victims and perpetrators of sexual abuse.

Dr. Atkins testified that most sex offenders suffer from a "lifetime condition." Consequently, the goals of their treatment (most often cognitive-behavioral therapy) are twofold:

(1) to help them understand the circumstances that led to their offenses, and (2) to develop skills for managing their behavior to prevent recidivism so that they can safely be reintegrated into the community. The success of treatment in that regard, Dr. Atkins explained, depends on the development of a "therapeutic alliance," built on trust and respect between the patient and therapist. The establishment of such a relationship fosters a "feeling of safety[,]" which permits the patient to be honest in treatment. This helps assure that the patient will achieve meaningful therapeutic progress, thus reducing his or her risk of recidivism.

Dr. Atkins opined that the "containment" approach used by the Parole Board, in which clinicians and parole officers collaborate, damages the therapeutic relationship by destroying the confidentiality on which that relationship depends. According to Dr. Atkins, the added requirement of polygraph testing only serves to weaken the relationship. He agreed that an offender's overcoming of denial for his initial offense is important to progress in treatment. He did not agree, however, that an acknowledgment of guilt had any established impact on the risk of recidivism, or that forcing an offender to admit guilt through a polygraph examination would be more beneficial

A-5435-10T2

than working through denial in therapy without resort to such technology.

Indeed, Dr. Atkins testified that overcoming denial only through the use of a polygraph might threaten the therapeutic alliance critical to successful treatment, and have a destabilizing effect on examinees. Dr. Atkins stated that he would only use a polygraph examination on a voluntary basis, and where a client believed the test would prove his or her innocence.

### Parole Officer Hritz

The court also heard the testimony of Ann Hritz, a parole officer who supervises offenders serving PSL and CSL terms. She is responsible for monitoring their compliance with conditions of parole. Hritz recounted the case history of one of her CSL supervisees, D.R. D.R. had reached the third phase of supervision when he was referred for an instant offense examination. D.R. continued to deny his guilt and consequently failed the exam. He was then returned to the first phase of supervision, which required him to attend further counseling to address his denial.

### Dennis Radabaugh's Deposition

Appellants also relied upon the deposition testimony of Dennis Radabaugh, which the trial court considered with the

parties' consent, due to his failing health[10] and his consequent inability to testify in court. Radabaugh was a police officer who became a clinical social worker providing psychotherapy mainly to sex offenders, first at the Adult Diagnostic and Treatment Center and then in private practice. Radabaugh was critical of the Parole Board's "containment" approach in matters of treatment and risk management. He asserted that the use of polygraph testing in connection with that approach was coercive and traumatic. Radabaugh opined that polygraphs generally do not yield benefits for treatment and, specifically, have no beneficial effect on sex offenders' risk of recidivism.

The Trial Court's Findings

At the outset of its written conclusions analyzing the pertinent facts presented at the hearing, the trial court[11] acknowledged "the controversy that surrounds polygraph testing generally[.]"[12]

---

[10] Radabaugh has since died.

[11] The panel expresses its deep appreciation to the trial court for undertaking the evidentiary hearing and issuing its lengthy findings of fact pursuant to our referral under Rule 2:5-5(b).

[12] In a lengthy footnote within the unpublished portion of our opinion in J.B. I., we identified much of the competing literature on the subject. As we noted:

> Several published articles reflect this scientific or academic disagreement
>
> (continued)

(continued)

regarding the rehabilitative or therapeutic value of polygraph examinations. See, e.g., Gershon Ben-Shakhar, The Case Against the Use of Polygraph Examinations to Monitor Post-Conviction Sex Offenders, 13 Legal & Criminological Psycho. 191 (2008) (exploring major polygraph techniques and applications for sex offenders, warning of the unreliability of one of the most common polygraph techniques, and concluding that such application may lead to an increase, rather than decrease, in rates of recidivism); Ewout H. Meijer et al., Sex Offender Management Using the Polygraph: A Critical Review, 13 Int'l J.L. & Psychiatry 423, 428 (2008) ("[T]here is no evidence supporting the accuracy of the [Control Question Test, a commonly-used polygraph testing method for sex offenders,] in PCSOT [post-conviction sex offender polygraph testing]."); Douglas C. Maloney, Comment, Lies, Damn Lies, and Polygraphs: The Problematic Role of Polygraphs in Postconviction Sex Offender Treatment (PCSOT), 84 Temp. L. Rev. 903 (2012) (discussing the disputed reliability of polygraph testing for sex offenders, but noting, perhaps, its appropriateness for therapeutic purposes). But see Don Grubin, The Case for Polygraph Testing of Sex Offenders, 13 Legal & Criminological Pyschol. 177, 187 (2008) ("The evidence suggests that, whatever the pros and cons of polygraph use in other settings, [post-conviction sex offender polygraph testing] can make a valuable contribution to sex offender treatment and management."); Jill S. Levenson, Sex Offender Polygraph Examination: An Evidence-Based Case Management Tool for Social Workers, 6 J. Evidence-Based Soc. Work 261, 369 (2009) ("[P]olygraph examination has emerged as a useful tool in encouraging the disclosure of

(continued)

37

(continued)

past sexual crimes . . . . [T]he accuracy of polygraph examination of sex offenders is unclear. On the other hand, a growing body of evidence supports the value of polygraph examination as a clinical tool in eliciting information for assessment . . . and monitoring purposes."); Lars Madsen, Shaun Parsons, & Don Grubin, A Preliminary Study of the Contribution of Periodic Polygraph Testing to the Treatment and Supervision of Sex Offenders, 15 J. Forensic Psychiatry & Psychol., 682, 682 (2004) (summarizing that "polygraph testing had an impact on the level of seriousness of the risk behaviours engaged in by sex offenders, but this only occurred after experience of the test itself"); Daniel T. Wilcox & Daniel E. Sosnowski, Polygraph Examination of British Sexual Offenders: A Pilot Study on Sexual History Disclosure Testing, 11 J. Sexual Aggression 3, 3 (2005) ("This application of the polygraph has shown merit as a means of obtaining additional information about past sexual offending behaviours. . . . This suggested that collaboration amongst treatment, supervision and polygraph professionals could help to contain sexual offending behavior more effectively, to improve and enhance public protection."); Theresa A. Gannon et al., The Evaluation of the Mandatory Polygraph Pilot (Univ. of Kent, Ministry of Justice Research Series, 2012) (observing an increased likelihood that sex offender case managers would rely on polygraph results to take preventative measures to protect the public from harm, and also that polygraph testing continued to elicit clinically-significant disclosures from sex offenders).

[J.B. I, supra, slip op. at 45-46 n.15.]

Illustrative of that general controversy, as the trial court noted, "the record in this case contains strong expert opinions on both sides as to the use and accuracy of polygraph testing for sex offenders." The court observed that it is "undisputed" that "everyone agrees it is an area where more research would be beneficial." Even so, the court found the factual record here sufficient to address the contentions we had referred for findings.

Having sifted through the proofs, the court offered this ultimate conclusion:

> The court finds that the Parole Board's current policies and practices regarding PCSOT polygraph testing for sex offenders represent <u>a reasonable choice among competing alternatives for supervision of sex offenders</u>. While clearly not free from controversy or valid criticism, both as to theory and practice, there is <u>enough support in the record for this court to conclude that there is a reasonable basis for using polygraph testing in the supervision of sex offenders serving CSL and PSL sentences in the community</u>.
>
> [(Emphasis added).]

The court provided several detailed reasons for this assessment. First, it addressed the persistent concerns about the scientific inaccuracy of polygraphs:

> Firstly, while Raymond Nelson relied on polygraph accuracy estimates of between 81% and 91% found in a review of polygraph research conducted by the National Research

Council of the National Academy of Sciences, these findings came with many caveats that included a conclusion by the Council that the estimates were likely overstated. . . . The study did find, however, that specific incident polygraph testing of examinees untrained in countermeasures designed to skew the test can discriminate lying from truth-telling at rates well above chance, though well below perfection. Nelson reached a similar conclusion in a statistical review of polygraph research he conducted with others for the American Polygraph Association in 2010-2011. . . . Notably, neither the National Research Council study nor the more recent APA study focused on PCSOT testing, but dealt more generally with polygraph reliability across many contexts. Studies addressing polygraphs used in sex offender treatment programs, however, have confirmed similar results. See, e.g., [Don] Grubin et al., A Prospective Study of the Impact of Polygraphy on High-Risk Behaviors in Adult Sex Offenders[,] 16 Sexual Abuse: A Journal of Research and Treatment 3 (July 2004), . . .; [Ron] K[o]kish, et al, Post-conviction Sex Offender Polygraph Examination: Client-Reported Perceptions of Utility and Accuracy[,] 17 Sexual Abuse: A Journal of Research and Treatment 2 (April 2005). . . . The court is persuaded that the National Academy of Sciences report, augmented by the conclusions in the recent APA meta-analysis and the PCSOT studies by Grubin and K[ok]ish, provide sufficient support to conclude that [PCSOT] polygraph testing is accurate enough to be used by the Parole Board for parole supervision and risk management.

Next, the court explained why, despite the criticisms of Dr. Iacono and others, current assessments of the polygraph regard it as a useful aid to parole supervision:

Of critical importance to the court in this regard is that the instant offense exams and maintenance exams based on a reasonable belief that particular parole conditions have been violated are both specific issue exams that come within the broad context of the studies conducted by the National Academy and APA. While Dr. Iacono testified that polygraph testing has been largely rejected by the scientific community, the National Academy study refutes that argument, although it is clear from that report and the APA study that <u>the modern approach to polygraphy views the testing more as an aid to decision-making based on information produced in the test rather than as an infallible measure of lying</u>. Also, the National Academy study in particular reviewed the same kind of criticisms of polygraph accuracy raised by Dr. Iacono, but ultimately still confirmed high levels of reliability for the testing, assuming that the exams were based on specific issues and involved examinees untrained in countermeasures. Moreover, while asserting that there is no theoretical explanation for assuming a deceptive individual would respond more strongly to a relevant question, [Dr.] Iacono grudgingly admitted that such an assumption was "not preposterous" and that testing could have some value when applied to sex offenders in treatment.

[(Emphasis added).]

The court did find that the accuracy rates of 71% to over 90%, as set forth in the National Academy and APA studies, "likely" overestimated the device's reliability. However, the court found that the fallibility of test results did not warrant a total elimination of polygraph testing in sex offender

41

monitoring and, instead, found "sufficient support in the record for the Parole Board's use of [PCSOT] polygraph testing." It noted:

> Even Dr. Iacono, with his harsh critique of the science undergirding polygraphs, could not state unequivocally that the Parole Board should stop performing instant offense exams. While the court acknowledges the validity of many of the concerns raised by Dr. Iacono, and reflected in an article he relied on by Ben-Shak[ha]r (<u>The case against the use of polygraph examinations to monitor post-conviction sex offenders</u>, <u>Legal and Criminal Psychology</u> (2008) . . . ), the court finds that their concerns <u>do not require banning use of the exams altogether, but rather suggest that the Parole Board should use care in incorporating polygraph results in decision-making regarding the supervision and risk management of sex offenders</u>. The National Academy report, for example, fully considered Ben-Shak[ha]r's opinions, which mirror the ones expressed by Dr. Iacono in his testimony, and found them unpersuasive as a challenge to the conclusions reached by the Academy.

> [(Emphasis added).]

The court commented favorably on the more recent changes made by the Parole Board to limit its reliance on technical polygraph results:

> While [Dr.] Iacono opposed using technical polygraph results alone to make parole decisions, <u>the Parole Board does not use results in that fashion anymore</u>. In fact, although the Carbone report . . . regarding the Parole Board Program found that parole status changed following administration of polygraphs 42% of the

A-5435-10T2

time, Parole Board officials explained why they thought that figure was unreliable even in 2009 and certainly would not be true today. They asserted unequivocally that polygraph results are not now used alone to make decisions, but are considered as part of a totality of the circumstances approach to decision-making. In addition, while Dr. Iacono also emphasized the ability of examinees to intentionally affect polygraph results, he had not reviewed the measures employed by the Parole Board to defeat such efforts. Those measures include using modern machines with specially designed sensors to detect even slight movements that could skew test results and examiner training to combat examinee manipulation. Employment of those measures cannot defeat all efforts by test takers to produce false results, but did somewhat blunt [Dr.] Iacono's criticism regarding countermeasures employed by examiners to affect test results.

[(Emphasis added).]

The court found especially persuasive the expert testimony of Dr. Bosley explaining how the Parole Board has been using "instant offense" polygraphs effectively in the treatment of sexual offenders:

Perhaps even more compelling support for continuing PCSOT polygraph testing by the Parole Board came from Dr. Bosley, who supervises a large treatment program for New Jersey sex offenders living in the community. He leads one therapy group of sex offenders and supervises other clinicians who work in the program. He is highly supportive of the use of polygraph instant offense exams because he has seen their efficacy in assisting sex offenders overcome denial of responsibility for their

sex crimes. He believes that overcoming denial is a critical component for most sex offender therapy because it shows the offender's ability to accept responsibility for his actions and enables the offender to move on to learning strategies to avoid similar conduct in the future. <u>Although there was little research support in the record to prove that instant offense exams reduce sex offender recidivism, the court finds that successful therapy does lead to reducing recidivism and that administration of instant offense exams can be a useful tool for therapists working with sex offenders</u>. This conclusion is supported by the <u>Practice Guidelines for the Assessment, Treatment, and Management of Male Adult Sexual Abusers</u> (2014), published by the Association for the Treatment of Sexual Abusers ("ATSA"), <u>which acknowledges that polygraph testing can be beneficial in sex offender treatment even though reliability and validity questions exist about polygraphs generally</u>. . . . ATSA includes the utilization of polygraph testing as an acceptable mechanism to employ in sex offender management, but does not endorse it over other methods. Moreover, there was evidence in the record that approximately 70% of community-based sex offender treatment programs for adults utilize some form of polygraph testing.

[(Emphasis added).]

The court added:

The court was struck by Dr. Bosley's endorsement of the instant offense exam even if polygraph accuracy was questionable. That view has been characterized as utilitarian because it considers the positive impact a polygraph program can have on sex offender treatment regardless of testing reliability. [<u>Dr.</u>] <u>Bosley mentioned that even the threat of having to take a</u>

44

polygraph can stimulate admissions relating to the instant offense that help sex offenders attain therapeutic goals. Captain Tallard testified, for example, that 200 sex offenders admitted their instant offenses after the PCSOT program was initiated in New Jersey, allowing those offenders to progress in treatment without having to submit to a polygraph exam. Moreover, there was testimony of disclosures being made in the interview portions of polygraph testing that were not reliant on the technical physiological results of the exam. [Dr.] Bosley also noted the positive impact in group therapy sessions of an offender's discussing having taken a polygraph exam. He testified that the impact of such discussions often allowed the examinee to be more honest with himself and encouraged other group members to embrace similar attitudes. That conclusion also was echoed in the Carbone report . . . , which found that administering a polygraph to one member of a therapy group produces a "vicarious" effect among other group members and encourages honesty with parole officers and treatment providers.

[(Emphasis added).]

The court recognized, but ultimately found non-dispositive, appellants' criticism of the Parole Board's past manner of using maintenance polygraphs as "fishing expeditions":

While the record shows greater support for the accuracy of instant offense exams than maintenance polygraphs, the Parole Board modified its policies in 2012 and effectively did away with broad screening exams akin to fishing expeditions that apparently had been conducted in the early days of the program. Such general inquiries into a parolee's behavior in the community were the least accurate type of PCSOT

<u>polygraph exam performed by the Parole Board</u>, and such tests elicited the harshest attack from Dr. Iacono. One of the reasons for [Dr.] Iacono's criticism was the difficulty in formulating appropriate control questions when there was no proof or reasonable suspicion that a parolee had engaged in a particular dangerous behavior or parole violation. <u>General screening tests untethered to specific incidents were also found to be unreliable in the National Academy study</u>. . . . <u>Testing in such a manner is no longer conducted by the Parole Board, however</u>, because <u>N.J.A.C.</u> 10A:72-3.4 now requires that a parole officer have "a reasonable belief that an offender is non-compliant with a condition(s) of supervision," and that such an assertion be reviewed and confirmed by a supervisor before a maintenance polygraph will be scheduled. <u>So maintenance polygraphs are now supported by some evidence to connect a parolee to dangerous behaviors and are not as vulnerable to attack on the basis of accuracy as randomly assigned exams with no basis to suspect that the parolee is engaging in dangerous behaviors</u>. Since test questions for maintenance exams can now be designed to examine the occurrence of specific behaviors or incidents, and Board examiners use question formulation techniques validated in the 2010-2011 APA study, <u>the court finds that such targeted maintenance exams are sufficiently reliable to allow the Parole Board to use them</u>, largely based on the analyses done by the National Research Council and Nelson's work for the APA. <u>Such exams, while not as reliable as instant offense testing, are likely to produce information that would be useful to parole supervision and treatment teams in making decisions regarding sex offenders in the community serving PSL and CSL sentences</u>. Even Dr. Atkins acknowledged as much in his testimony, reserving his highest criticism for the instant offense

A-5435-10T2

exams because of his belief that they undermined the therapeutic relationship.

[(Emphasis added).]

The court also found significant the Parole Board's change of its practices to avoid relying on polygraph results alone as a basis for altering an offender's conditions of supervision:

[T]he Parole Board officials who testified made it clear that the program as currently administered does not use technical polygraph results from maintenance exams alone to change parole conditions for sex offenders, as [Dr.] Iacono assumed was a common practice based on his review of the Carbone report. That 2009 study reviewed information from the early days of the Parole Board program and reported that polygraph results led to changes in parole supervision for 42% of the sex offenders who took the exams. . . . [Dr.] Iacono was highly critical of using questionable results alone to alter conditions of parole. Nelson also strongly conveyed that maintenance polygraph results should only be used as one of many factors in making parole supervision decisions—a position consistent with the ATSA practice guidelines, which note that, "When the polygraph is utilized, findings are to be interpreted in conjunction with other relevant information to inform decision-making." . . .

Although the court is not convinced that such a policy [of limited relevance] was carefully followed in the early days of the Parole Board's PCSOT program, and may not have been followed in individual cases in recent years, the court does conclude that the current program is based upon that approach. Since that approach is a reasonable one when coupled with the testing requirements now contained in N.J.A.C.

10A:72-3.4, the court finds sufficient support in the record for the continued use of maintenance polygraphs by the Parole Board. While some of the recorded polygraph exams played during the trial revealed less than optimal practices, continued PCSOT examiner training apparently has led to changes in the administration of maintenance polygraphs by the Parole Board and how the results are utilized. Nelson testified, for example, that interviews should not be interrogations. Yet some excerpts of exams in the record showed examiner conduct that was very adversarial in nature. Sergeant Cavanaugh testified, however, that a different, less accusatory approach is now being utilized. The court finds that, while somewhat disconcerting, deviations from reasonable policies in individual cases simply are insufficient to compromise the overall policy choices made by the Parole Board about using maintenance polygraphs for parole supervision of sex offenders serving PSL and CSL sentences in the community.

[(Emphasis added).]

Lastly, the court addressed the so-called "containment model" of treatment utilized by the Parole Board with the input of the polygraph results:

Although not directly part of the issues referred to this court for review, the record also reveals strong differences of opinion about the containment model of treatment and parole supervision adopted by the Parole Board. This approach to sex offender parole supervision is endorsed by ATSA, which sees clearly delineated collaboration between parole officers and treatment professionals as a means to promote "successful public safety and client outcomes." . . . The criticism of this kind of program voiced by Dr. Atkins and Dennis

48                                    A-5435-10T2

Radabaugh focused on the absence of confidentiality between therapist and offender in a collaborative approach and the damage to the therapeutic alliance that could be caused by such lack of confidentiality. Dr. Bosley noted, however, that the scope of the collaboration is made clear to participants when they enter the program. In his view, the positive aspects of collaboration to the offender and the community far outweigh any negatives.

The record shows that collaboration is an appropriate and reasonable approach to the parole supervision of sex offenders. While not the only way to structure a treatment and supervision program, and while not free of controversy, the court did not find the expert critique of the approach sufficient to undermine the Parole Board's policy choice in this complicated area of parole supervision, especially when Dr. Bosley provided such strong support for the design of the program and the approach is sanctioned by ATSA.

[(Emphasis added).]

## II.

We now consider appellants' legal arguments, joined by the Public Defender, in light of these findings of the trial court and the applicable law.

Appellants contend that the Parole Board's use of polygraph testing — particularly maintenance examinations — violates their constitutional rights of privacy, freedom of thought, and due process under the First, Ninth, and Fourteenth Amendments. They further argue that the polygraph testing procedures

unconstitutionally impinge upon their Fifth Amendment privilege against self-incrimination and their Sixth Amendment right to counsel. Appellants also invoke cognate protections under the New Jersey Constitution. Apart from these constitutional arguments, appellants also contend, as a matter of administrative law, that the Parole Board's polygraph program must be set aside as arbitrary, capricious, and unreasonable.

As this court previously elaborated in J.B. I, supra, 433 N.J. Super. at 336-39, a discussion which we incorporate by reference here, parolees and sex offenders such as appellants who are under post-release PSL or CSL supervision have limited constitutional protection from governmental oversight of their activities in society.

The United States Supreme Court has constitutionally permitted parolees to be "subjected to 'conditions [that] restrict their activities substantially beyond the ordinary restrictions imposed by law on an individual citizen.'" Id. at 337 (alteration in original) (quoting Morrissey v. Brewer, 408 U.S. 471, 478, 92 S. Ct. 2593, 2598, 33 L. Ed. 2d 484, 492 (1972)). Because of their recognized special proclivity toward recidivism, sexual offenders on post-release oversight under PSL or CSL can be constitutionally restricted in their activities by the Parole Board, so long as they receive due process

protections such as notice and an opportunity to object to those restrictions and provided that the Parole Board does not engage in "arbitrary government action." Id. at 336, 338 (citing Jamgochian v. N.J. State Parole Bd., 196 N.J. 222, 237-38, 241-42 (2008)).

In essence, persons such as appellants on PSL or CSL have less constitutional freedoms than other civilians. Even so, the government must treat them with fairness and not in an arbitrary or unreasonable manner.

Aside from these constitutional standards, we also must apply the well-established criteria for the review of administrative agency actions. In general, an agency's decision will be sustained "unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record." In re Herrmann, 192 N.J. 19, 27-28 (2007) (citing Campbell v. Dep't of Civil Serv., 39 N.J. 556, 562 (1963)); see also Aqua Beach Condo. Ass'n v. Dep't of Cmty. Affairs, 186 N.J. 5, 15-16 (2006). "The burden of demonstrating that the agency's action was arbitrary, capricious or unreasonable rests upon the [party] challenging the administrative action." In re Arenas, 385 N.J. Super. 440, 443-44 (App. Div.), certif. denied, 188 N.J. 219 (2006); McGowan v. N.J. State Parole Bd., 347 N.J. Super. 544, 563 (App. Div.

2002); <u>Barone v. Dep't of Human Servs., Div. of Med. & Health Servs.</u>, 210 <u>N.J. Super.</u> 276, 285 (App. Div. 1986), <u>aff'd</u>, 107 <u>N.J.</u> 355 (1987).

We now apply these principles in the next two parts of this opinion. First, we address in Part III appellants' general challenges to the Parole Board's use of polygraph testing. Second, in Part IV we consider their discrete claims under the Fifth and Sixth Amendment relating to self-incrimination and the right to counsel.

III.

An important predicate to our legal analysis in this Part is specifying exactly what the polygraph test "results" are and how the Parole Board uses them. Conceptually, a polygraph session might produce two very distinct kinds of "results."

First, an individual who is examined can make statements before, during, or after being strapped to the machine, either in response to queries from the examiner, or through unprompted assertions. Those statements might convey information about the individual's past conduct, his present circumstances, or his future plans. In this sense, substantive assertions can "result" from the polygraph process. Indeed, as some of the witnesses indicated and the trial court found, the mere scheduling of a polygraph session at times will provoke a sex

52

offender who is on PSL or CSL to make revelations, or speak about certain topics more candidly, than might occur if the offender were taking part in a routine interview with a parole officer.

The second kind of conceivable "result" from a polygraph encompasses the machine-generated data or report of the examiner, measuring whether the subject's physiological responses are indicative of deception, or truthfulness, or are inconclusive. This machine-generated "result" is not in the form of an assertion by the individual with substantive content. Instead, it is a technical response.

As we noted in N.J.S.A. 30:4-123.88, the Legislature instructed that "[t]he results of the polygraph examination shall not be used as evidence in court to prove that a violation of the special sentence of [PSL or CSL] or condition of discharge has occurred." (Emphasis added). See also N.J.A.C. 10A:72-3.9(c) (repeating this identical proviso in the polygraph regulations). We consider the term "results" in this passage to refer to the machine-generated technical data produced from an administered polygraph, rather than any substantive assertions that the individual made during the session. That is the most logical interpretation of the phrase. See Saccone v. Bd. of Trs. of Police & Firemen's Ret. Sys., 219 N.J. 369, 380 (2014)

(reiterating the well-settled proposition that "[t]he language of [a] statute must be construed in accordance with its ordinary and common-sense meaning"); see also State ex rel. K.O., 217 N.J. 83, 94 (2014).

Parolees and offenders on PSL or CSL oversight have a general duty to cooperate with their parole officers, and provide them with honest information in response to their questioning. Those substantive responses commonly are used by parole officers to make day-to-day decisions about the individual's conditions of release, even when no polygraph device is used during the interview.

Admissions of wrongful conduct that the individual being interviewed makes to the officer can be used as evidence in a parole revocation hearing. If the statement comprises an admission of a criminal offense, it may be used as evidence in a criminal prosecution. Subject to the constraints we express in Part IV of this opinion for the protection of the offender's privilege against self-incrimination, we discern no constitutional or legal prohibition against the Parole Board using such substantive assertions to make decisions concerning the individual's status.[13]

---

[13] We also do not regard the disclosures to the parole officer or parole authorities as an improper invasion of the offender's

(continued)

The Legislature plainly contemplated that its restriction on the use of polygraph "results" in <u>N.J.S.A.</u> 30:4-123.88 refers to the device's, machine-generated data, and the technical analysis of that data. Given that common-sense understanding, we turn to the next phrase of the statute, i.e., prohibiting such "results" from being "used as evidence <u>in court</u> to prove that <u>a violation</u> of [the offender's PSL or CSL status] or condition of discharge has occurred." <u>N.J.S.A.</u> 30:4-123.88 (emphasis added).

Literally construed, this clause omits a wide range of negative consequences that an individual might face from the results of a polygraph, apart from a "violation" of the terms of his supervision or the conditions of his discharge. The statute's reference to "violations" of a special sentence or conditions of discharge apparently does not cover prospective adjustments that a parole officer might consider making to the

(continued)
privacy. The offender on PSL or CSL must reveal his activities and plans to his parole officer as a matter of course during his monitoring. <u>See</u> <u>Jamgochian</u>, <u>supra</u>, 196 <u>N.J.</u> at 238. We also perceive a constitutional difference between the compelled disclosure of a released sex offender's private information to a supervising parole officer, rather than to the public at large or to some other wide span of recipients. <u>Cf.</u> <u>Doe v. Poritz</u>, 142 <u>N.J.</u> 1, 77-91 (1995) (addressing the more substantial privacy interests implicated by the public disclosure of the whereabouts of convicted sex offenders mandated by Megan's Law).

individual's permitted activities if he has "failed" a polygraph. For example, nothing in the statute or the related regulation appears to prevent the parole officer from imposing a curfew, an out-of-state travel ban, a prohibition on going to schools or other specified locations, and the like, after considering the technical results of a polygraph examination.

The statute poses further ambiguity by not clearly defining the term "in court" when instructing that polygraph results "shall not be used as evidence in court" for purposes of proving a violation. Ibid. The term "court" surely encompasses the trial divisions of the Superior Court and the federal courts. We construe the term "court," however, to have an even wider meaning, deeming it to also cover quasi-judicial administrative hearings, as well as appeals that may be taken from the Parole Board's agency decisions to this court and to the Supreme Court.

At oral argument on this appeal, the Deputy Attorney General representing the Parole Board acknowledged that the word "court" in the text of N.J.S.A. 30:4-123.88 does, in fact, encompass appellate courts reviewing the Parole Board's final agency decisions. Hence, if, hypothetically, an offender on PSL or CSL fails a polygraph examination and his parole officer then decides to increase restrictions on his liberty, appellate review of that agency decision would occur in a "court," within

56                                                         A-5435-10T2

the meaning of N.J.S.A. 30:4-123.88. Of concern, however, is that the statutory prohibition is limited to polygraph results used to prove a "violation" of the individual's past conditions of release. The prohibition literally does not extend, as written, to decisions made to tighten future supervision of an individual on PSL or CSL.

We have no difficulty with the Parole Board using technical polygraph results for what have been discussed in this record and in research literature as purely "therapeutic" purposes in the treatment of sex offenders. We specifically adopt the trial court's well-supported findings in this record that "instant offense" polygraphs administered pursuant to N.J.A.C. 10A:72-3.3(a) do provide a reasonable tool to the Parole Board in the treatment of sex offenders who may continue to exhibit denial of the sexual offenses they committed, or the details of such reflected in the pre-sentence report. Polygraph results, when considered in this relatively benign fashion, appear to provide at least some indicia that an offender who is in denial might, for example, benefit from greater or a different method of psychological counseling.

To be sure, the primary focus of appellants and the intervenor in this case has not been on instant offense polygraphs. Rather, their main target has been periodic

maintenance examinations administered under N.J.A.C. 10A:72-3.3(b) "to verify the activities, behavior and truthfulness of an offender as related to compliance with the conditions of supervision." Appellants and the Public Defender argue that the technical results produced from such maintenance polygraphs have led the Parole Board arbitrarily to take adverse actions against persons monitored on PSL or CSL, such as tightening limitations on their prospective activities.

In this regard, the challengers emphasize the data gathered by Carbone, cited in the trial court's decision,[14] finding that offenders' parole status changed 42% of the time following a polygraph examination. The challengers urge that such decisions predicated on, in full or in part, polygraph test results — which our New Jersey court system continues to deem unreliable and inadmissible — violates their constitutional rights and is arbitrary, unreasonable, and capricious.

The Parole Board responds that, as the trial court found, it has revised its practices in recent years to reduce the potential for misuse or overuse of polygraph results. For one thing, the Parole Board has enacted a regulation, N.J.A.C.

_____

[14] We also cited the Carbone study in the unpublished portion of our earlier opinion. J.B. I, supra, slip op. at 43 n.14. We need not decide whether the Parole Board's past citation to the Carbone study on its website comprises an adoptive admission under N.J.R.E. 803(b)(2).

10A:72-3.4(a), that now requires a parole officer to have "a reasonable belief that an offender is non-compliant with a condition[] of supervision[,]" a belief reviewed and confirmed by a supervisor, before a maintenance examination can be administered. In addition, the Parole Board has adopted a policy, apparently voluntarily, that it will not use adverse polygraph results as the "sole" basis of decision-making. Both of these caveats were identified in the trial court's decision as positive factors that help assure that the polygraph program is administered in a fair manner.

We agree that the "reasonable belief" prerequisite for scheduling maintenance polygraphs and the Parole Board's self-imposed policy to require additional evidence separate from a failed polygraph to take adverse action serve to ameliorate, to some degree, the problems cited by appellants and the Public Defender. Yet, we must not lose sight of this State's long-standing judicial aversion to polygraph evidence and our persisting institutional concerns about the scientific inaccuracy and unreliability of the instruments. See, e.g., A.O., supra, 198 N.J. at 86. Even the Parole Board's own witnesses in this case agreed that the device's error rate, when used for a maintenance exam, has been estimated by some researchers to be as high as 29%. Indeed, there is a

fundamental difference between the _evidential_ use of a polygraph to prove or dispute facts in a court where a person's rights are adjudicated versus a _therapeutic_ context.

We also must be mindful that as an administrative agency, the Parole Board must base its decisions on non-arbitrary grounds. When those agency decisions are challenged on appeal in this court, the Parole Board must point to competent evidence in the administrative record that supports its determination. In reviewing such agency decisions, we "must survey the record to determine whether there is sufficient credible _competent evidence_ in the record to support the agency['s] . . . conclusions." _Clowes v. Terminix Int'l, Inc._, 109 _N.J._ 575, 587 (1988) (emphasis added) (overturning an agency's decision where its determination was not adequately supported by such competent evidence, including medical test results that were not sufficiently shown to be probative of the issues); _see also Wojtkowiak v. N.J. Motor Vehicle Comm'n_, 439 _N.J. Super._ 1, 20 (App. Div. 2015) (reiterating the need for "sufficient _competent_ proof" in administrative proceedings) (emphasis added).

The Parole Board's continued reliance on technical polygraph results as an acceptable form of corroborating evidence to support its decisions to increase restrictions on persons who are on PSL or CSL monitoring clashes with our

judiciary's[15] systemic aversion to the evidential use of polygraphs. We do not, for example, allow prosecutors to present polygraph results not properly stipulated to at criminal trials as "extra" proof of a defendant's guilt. See A.O., supra, 198 N.J. at 90. Nor do we ordinarily tolerate the non-stipulated admission of polygraph evidence in civil litigation. Cf. Senders v. CNA Insurance Cos., 212 N.J. Super. 518, 520 (Law Div. 1986) (recognizing that "almost all courts that have considered the question" of the admissibility of polygraph evidence in civil suits "have held that the results of a

---

[15] We do not read Engel v. N.J. Dep't of Corrections, 270 N.J. Super. 176, 179-81 (App. Div. 1994) (allowing certain polygraph evidence in prison disciplinary matters) to the contrary. Nothing in the court's opinion indicates that Engel argued that the polygraph of the informant taken by the Department of Corrections ("DOC") was incompetent evidence or unconstitutional. Instead, he sought his own polygraph of the informant pursuant to a DOC regulation, as defense proof that could "level [the] playing field." Id. at 180. The panel in Engel recognized the "degree of unreliability which continues to attend polygraph testing," id. at 180-81, but simply "accede[d] to it" in the context presented in light of the controlling administrative regulation. Id. at 181 n.3. The panel declined to endorse the use of polygraph evidence "beyond the extent to which it is otherwise now admissible" under the DOC regulation. Ibid. Moreover, there was no detailed record in Engel with expert testimony, as there is here, exploring in depth both the uses and pitfalls of polygraph testing.

polygraph test or the refusal to take a polygraph test are not admissible in evidence").[16]

Polygraphs continue to be treated as incompetent evidence in our courts of law. Unless and until our Supreme Court says otherwise, we do not countenance allowing polygraph results to "tip the balance" in satisfying the applicable standards of evidential proof.

Our legal analysis — informed as it is by the thorough and meticulous fact-finding of the trial court — ultimately hinges here upon the critical distinction between using polygraphs as a therapeutic tool to aid in the treatment of a sex offender in a manner that does not curtail his liberties, as opposed to a competent source of forensic proof in a court with rules of evidence dedicated to the search for the truth. See N.J.R.E. 102 (identifying the ascertainment of the truth as a key objective of the Rules of Evidence). The line between these two very different contexts must be scrupulously honored. Otherwise, juries and other fact-finders would have the

---

[16] Despite this almost universal exclusion, the Law Division in Senders permitted the polygraph results of the insured in an insurance coverage dispute to be admitted into evidence because the subject of the test, i.e., the insured, volunteered to be tested and tendered the results affirmatively to show that he was not involved in the arson. Id. at 520-21.

prerogative to engage in random exercises such as coin-flipping when the competent evidence in the record is in equipoise.

This leads us to conclude, as a matter of law, that the terms of the statute and the Parole Board's more recent practices reducing the evidential role of polygraph results do not go far enough to assure appellants and other persons on PSL and CSL that they will not have their liberties restricted or taken away arbitrarily after "failing" a polygraph exam. In stating that conclusion, we need not and do not find that the statutory scheme or the Parole Board's regulations and policies violate the Federal Due Process Clause or equivalent guarantees under the New Jersey Constitution. Instead, we rest our decision in this regard on well-settled principles of administrative law, which require agency decisions, when they are challenged in court, to be based upon substantial credible evidence that is legally competent.

We therefore hold that the Parole Board may continue to use "instant offense" and "maintenance" polygraph examinations for therapeutic purposes in the treatment of sex offenders on PSL or CSL. The Parole Board may also use the substantive assertions made by such polygraphed offenders for both therapeutic and evidential purposes. Consistent with our Supreme Court's long-standing precedent treating non-stipulated polygraph results as

A-5435-10T2

incompetent evidence, we disallow, however, the Parole Board from relying on technical polygraph results in any evidential manner when making decisions to penalize PSL or CSL offenders or to curtail their activities.

That said, nothing in this opinion forecloses the Parole Board from continuing to administer polygraphs for what have been described as "risk management" or "containment" objectives, provided that the technical results of polygraph exams are not relied on or cited by the Parole Board in justifying a curtailment of the subject's liberties.

A simple example will help illuminate these principles. Suppose that an offender on PSL or CSL, as a condition of his monitoring by his parole officer, is currently allowed to leave the State of New Jersey only during weekdays and solely for employment purposes. Suppose that the Parole Board then receives information from a third party that she thinks, although she is not certain, that she recently saw the offender on a Sunday attending a Phillies game at Citizens Bank Park in Pennsylvania. Assume that an appropriate supervisor considers the informant's report as "reasonable belief" under N.J.A.C. 10A:72-3.4(a) to bring the offender in for a maintenance polygraph, to ascertain if he has not complied with his weekend out-of-state travel ban. Suppose further that the parole

authorities decide that, if the allegation of the offender's presence at the Sunday Phillies game is true, they will not charge him with a violation but instead will tighten his existing travel restrictions.

If the offender freely makes any statements, either during the pre-interview, the polygraph session itself, or the post-interview admitting that he was at the game in Pennsylvania on a Sunday, the Parole Board may use such admissions as evidence to support a decision to tighten the offender's travel limitations. For instance, the Parole Board may disallow him from leaving the State at any time except when specifically authorized by his parole officer.

By contrast, suppose the offender in this hypothetical denies being out of state at the Phillies game on a Sunday, and when asked about that topic while on the polygraph he generates a reading on the device indicative of deception. In that scenario, under the principles set forth in this opinion, the Parole Board may not rely, even in part, on the machine-generated result. The Parole Board must instead rest its decision to increase the offender's restrictions solely on non-polygraph evidence such as the informant's observations.

In sum, we uphold the Parole Board's non-evidential use of polygraphs in this distinctive PSL and CSL setting, subject to

the conditions we have expressed. We find no other constitutional impediments to the Parole Board's use of polygraphs for these limited purposes.

## IV.

We now turn to the discrete issues of self-incrimination and the right to counsel.

As a starting point, one must adhere to the guiding principles set forth long ago by the United States Supreme Court in its seminal opinion on this subject in Minnesota v. Murphy, 465 U.S. 420, 104 S. Ct. 1136, 79 L. Ed. 2d 409 (1984). The Court recognized in Murphy that states may require a person who is under the supervision of a parole or probation officer "to appear and discuss matters that affect his probationary status[.]" Id. at 435, 104 S. Ct. at 1146, 79 L. Ed. 2d at 424. "[S]uch a requirement, without more, does not give rise to a self-executing privilege [against self-incrimination]." Ibid.

The Court further held in Murphy that routine parole interviews do not comprise an instance of "custodial interrogation" that require parole officers to issue Miranda warnings. Id. at 433, 104 S. Ct. at 1145, 70 L. Ed. 2d at 423. As the Court noted, the probationer in that case, Murphy, "was not physically restrained and could have left the office[.]" Ibid. Moreover, his "regular meetings with his probation

A-5435-10T2

officer should have served to familiarize him with her and her office and to insulate him from psychological intimidation that might overbear his desire to claim the privilege [against self-incrimination]." Ibid.

Significantly, the Court in Murphy did hold that, when invoked by the parolee or probationer, he does have a constitutional right under the Fifth Amendment to refuse to answer questions from his parole officer with responses that could incriminate him. Id. at 426, 104 S. Ct. at 1141, 79 L. Ed. 2d at 418. The Court expressly instructed that the Fifth Amendment entitles a person "not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." Ibid. (emphasis added). "A defendant does not lose this protection by his conviction of a crime; . . . if those statements are compelled[,] they are inadmissible in a subsequent trial for a crime other than that for which he has been convicted." Ibid.; see also State v. Davis, 67 N.J. 222, 226 (1975) (similarly holding that parole interviews are non-custodial in nature and do not require Miranda warnings, despite the parolee's obligation to cooperate and "fully and unreservedly in the parole experiment").

The Parole Board has made a substantial effort to honor these Fifth Amendment precepts by adopting a regulation, N.J.A.C. 10A:72-3.7(d), which requires a polygraph examiner to "comply with the procedures of the Division of Parole regarding an offender's right to remain silent as it relates to divulging identifying information of any unreported victim(s) or crime(s)." Nonetheless, "any voluntary admission(s) made by the offender regarding unreported victim(s) or crime(s)" must be reported to law enforcement. N.J.A.C. 10A:72-3.9(b). Moreover, as we have already noted, an offender's failure to submit to a polygraph, absent good cause, may be prosecuted as a third-degree crime. N.J.S.A. 2C:43-6.4(d).

As the trial court found, largely based upon Captain Tallard's testimony at the hearing, if "a parolee makes a spontaneous incriminating statement during the course of the polygraph examination, the examiner is instructed to provide Miranda warnings to the test subject." See also N.J.A.C. 10A:72-3.6 (detailing the required contents of the "disclosure form" to be provided to the offender before he submits to the examination).

We reject appellants' contention that the polygraph sessions conducted by the Parole Board are a form of custodial interrogation that requires the examiner to administer Miranda

warnings at the outset of the session.  Accord United States v. Daniels, 541 F.3d 915, 926 (9th Cir. 2008) (concluding that the polygraphs administered as a condition of supervised release are not custodial interrogations), cert. denied, 566 U.S. 1111, 129 S. Ct. 1600, 173 L. Ed. 2d 687 (2009); United States v. Stoterau, 524 F.3d 988, 1004 (9th Cir. 2008) (same), cert. denied, 555 U.S. 1123, 129 S. Ct. 957, 173 L. Ed. 2d 153 (2009); United States v. Lee, 315 F.3d 206, 212 (3d Cir.) (same), cert. denied, 540 U.S. 858, 124 S. Ct. 160, 157 L. Ed. 2d 106 (2003). The individual being tested is not handcuffed or shackled. Although he is attached with straps to the machine while it is measuring his responses to the examiner's questions, the subject is not being confined with the same degree of physical restraint as a person who has been placed under arrest. The subject can face later consequences if he chooses to leave before the examination is completed but, unlike an arrestee at a police station, he is not subject to immediate confinement if he refuses to cooperate.  The tests, including the interview portion, typically do not last more than an hour and a half.

As the record shows, the Parole Board strives to avoid having the polygraph sessions conducted as interrogations.  The trial court specifically found that although some examinations in the past did reflect overly adversarial examiner conduct, a

practice that the court termed "disconcerting," the Parole Board presented credible testimony that "a different, less accusatory approach is now being utilized."[17]

On the whole, we conclude that the polygraph examinations, as currently administered by the Parole Board, in light of the trial court's findings, are not the equivalent of custodial interrogation that requires Miranda warnings to be administered at the beginning of the session or which authorize test subjects to skip the scheduled testing appointments.

We also reject appellants' argument that they are entitled under the Sixth Amendment to have counsel present during the polygraph session. The presence of counsel is likely to diminish the positive potential therapeutic benefits of the polygraph testing and to inject adversarial elements into the procedure. We decline to strike down the Parole Board's regulation that disallows examinees from having an attorney or other personal representation present. N.J.A.C. 10A:72-3.7(e). That said, if an examiner refuses to honor an examinee's invocation of privilege in response to specific questions that could be incriminatory, or is abusive during the session, the

_____

[17] Nevertheless, we suggest that the Parole Board give serious consideration to Dr. Iacono's testimony indicating that the use of blind peer review can aid in achieving consistency among examiners in the future.

subject may pursue appropriate redress against the Parole Board on a case-by-case basis.

Although the topic was not addressed either way in the trial court's conclusions, we are persuaded that it would be beneficial for the Parole Board to revise its disclosure and exam procedure regulations in N.J.A.C. 10A:72-3.6 and -3.7 to spell out more clearly what uses of the polygraph testing are allowed and disallowed. In particular, the limitations on the non-evidential use of the machine-generated test results that we have mandated in this opinion should be made known to test subjects, so that they understand how the testing can and cannot be used by the Parole Board. These updated policies should be adopted formally through rule-making, which we require the Parole Board to complete, with appropriate public notice and comment, within six months of this opinion. See Metromedia, supra, 97 N.J. at 331.

V.

The remaining arguments raised by appellants and the Public Defender seeking to invalidate the Parole Board's polygraph testing program lack sufficient merit to be discussed in this opinion. R. 2:11-3(e)(1)(E). Aside from the important conditions or limitations we have identified, appellants have not met their burden to set aside the presumptively-valid

statutory and regulatory scheme. N.J. Sports & Exposition Auth. v. McCrane, 61 N.J. 1, 8, appeal dismissed sub nom., Borough of E. Rutherford N.J. v. Sports & Exposition Auth., 409 U.S. 943, S. Ct. 270, 34 L. Ed. 2d 215 (1972). As with the Internet access issues in J.B. I, we do not, however, foreclose future as-applied challenges by offenders who establish that these requirements have not been met in their individual cases. J.B. I, supra, slip op. at 4.

The Parole Board's policies and procedures for polygraph testing that have been challenged in this case are consequently affirmed in part, modified in part, and remanded to the Parole Board for corrective action in a manner consistent with this opinion. The previously-imposed stay of the polygraph testing of appellants is lifted, effective ninety days from this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION